Charles D. SLATER, d/b/a Charles D. Slater Enterprises and Euro-Pirates International, Inc., a corporation of the State of Louisiana, Plaintiffs,

v.

TEXACO, INC. and Texaco Trinidad, Inc., a corporation of the State of Delaware, Defendants.

Civ. A. No. 77–310.

United States District Court,
D. Delaware.

Jan. 9, 1981.

Bernard A. Van Ogtrop of Cooch & Taylor, Wilmington, Del., and Michael R. O'Keefe, III, and Richmond M. Eustis of Monroe & Lemann, New Orleans, La., of counsel, for plaintiffs.

Robert Aulgur, Jr. and Ernest S. Wilson, Jr. of Wilson & Whittington, Wilmington, Del., and Robert M. Contois, Jr. of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., of counsel, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Chief Judge.

In this Admiralty action, plaintiffs Charles D. Slater, d/b/a Charles D. Slater Enterprises ("Slater"), and Euro-Pirates International, Inc. ("Euro-Pirates"), seek to recover $410,792.61 in damages and prejudgment interest from defendants, Texaco, Inc. ("Texaco") and Texaco-Trinidad, Inc. ("Textrin"), for lost revenues and damages allegedly suffered by the M/V Sir Henry Morgan ("the Morgan"), a ship owned by Slater and operated by Euro-Pirates, as the proximate result of a collision which occurred in Guayaguayare Bay off of Galeota Point, Trinidad, between the Morgan and an allegedly submerged, unmarked wellhead owned by Textrin.

Plaintiffs contend that Textrin's failure adequately to mark or to remove the well-head constituted negligence and that said negligence was the sole proximate cause of the collision and the claimed damages. Defendants, on the other hand contend that Textrin was not at all negligent, that plaintiffs' negligence caused or contributed to the casualty, that plaintiffs failed to mitigate their damages and that the damages claimed are excessive.

The case was tried by the Court sitting without a jury on January 28 and 29, 1980. After carefully considering the sufficiency and weight of the testimony adduced at trial [1] and the depositions [2] and documentary evidence admitted, as well as the parties' post-trial submissions,[3] the Court enters the following findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

1. Plaintiff, Slater, is a resident of Louisiana and is and was at all pertinent times the owner of the Morgan.[4] Plaintiff, Euro-Pirates, is a Louisiana corporation of which Slater is the sole owner and at all pertinent times operated the Morgan pursuant to a bareboat charter agreement with Slater.[5] Euro-Pirates generally is engaged in the offshore supply vessel business. In this business it services and provides maintenance and crews for vessels leased from Slater and in turn charters those vessels to other companies which use their services in various tasks relating to the offshore oil drilling industry. The tasks performed, among others, include towing oil rigs, towing in general, hauling supplies to and from oil rigs, and setting the anchors for oil rigs.[6]

2. Defendant, Textrin, a Delaware Corporation, is a wholly owned subsidiary of defendant, Texaco, also a Delaware corporation.[7] Textrin, at all pertinent times, held an oil lease, originally granted by the Government of Trinidad, covering some 13,-800 acres located for the most part in Guayaguayare Bay off the southern coast of the island of Trinidad [8] ("the lease").

3. Textrin drilled three wells on the lease, designated GBM–1, 1X and 2.[9] GBM–1X was the only producing well ever drilled on the lease.[10] Textrin established a well-head on the GBM–1X site which, after completion, consisted essentially of a pipe with a crow's nest, marked by a white flashing light 23 feet above the water level.[11]

4. According to records in Textrin's files, Textrin printed a notice regarding the establishment of the well-head, GBM–1X, in two Trinidadian newspapers and prepared a Notice to Mariners dated December 1, 1972 which it forwarded to the Harbour Master for Trinidad and Tobago.[12] This was the only Notice to Mariners ever written regarding GBM–1X. It informed Mariners of the location of the well-head and described it as carrying "a white flashing light at a height of 23 ft., visible all round the horizon." [13]

The evidence, however, clearly shows that, at least as of December, 1976, the information contained in the Notice was unavailable. The Notice was never received by the United States Mapping Agen-

---

1. The trial transcript ("Tr.") is found at Docket Items ("D.I.") 73 and D.I. 73A.

2. D.I. 12; 30, p. 2, l.12–p. 5, l.24–p. 55, l.9–p. 62, l.3; 48; 49; 53; 64; and 67.

3. Plaintiffs filed a post-trial opening brief (D.I. 74). Defendants filed an answering brief (D.I. 75), to which plaintiffs responded with a reply brief (D.I. 76). Briefing was completed on September 15, 1980.

4. Tr. 7; D.I. 66.

5. Tr. 7; D.I. 66.

6. Tr. 7–8.

7. D.I. 5, ' 3; D.I. 53, p. 5.

8. Plaintiffs' Exhibits ("PX") 1, 6, and 7; D.I. 49, pp. 7–8.

9. PX 6 and 7; D.I. 49, p. 16.

10. D.I. 12, pp. 21–23.

11. PX 9 and 12.

12. D.I. 53, pp. 40–43; PX 11 and 12.

13. PX 12.

cy and, as of November 3, 1978, the location of GBM–1X did not appear on any of its official charts.[14] At the time of the collision, on December 6, 1976, the Morgan had a full set of the most recent official charts for Guayaguayare Bay and the well-head did not appear on those charts.[15] Moreover, the Captain of the Morgan had gone to the Harbour Master's Office prior to the collision to obtain any Notices to Mariners but was told that the Notices could not be provided and would have to come from his company agent.[16] Euro-Pirates, in fact, forwarded all new Notices to Mariners to the captains of its ships.[17] Finally, shortly after the collision, the Harbour Master professed to having no knowledge of any obstruction whatsoever in that part of Guayaguayare Bay where the accident occurred and could provide no information as to the existence of any obstruction to navigation in that area. The well-head did not appear on the charts in the Harbour Master's Office.[18] Thus, even if the Notice to Mariners had been published, as Texaco's records appear to indicate, the information contained in that Notice soon sank into obscurity and by 1976 was unavailable and inaccessible to even the most diligent mariner.

5. When the rig with which GBM–1X had been drilled was leaving the site, it struck the well-head causing the structure to lean.[19] From then on, the well-head continued to fall and by July, 1973 the uppermost portion was awash at all times. Because the well-head continued to fall and the fact that the well was leaking oil, it became necessary for Textrin to plug the well with cement and to abandon it as a producing well. Within a few days after it was plugged, the well-head completely disappeared beneath the water.[20]

6. Under the terms of the lease, the Government of Trinidad required that all operating well-heads be marked with a light and all other well-heads be cut off at the mud-line under water at the time of final abandonment.[21] Accordingly, GBM–1X was initially marked with a white flashing light and GBM–2 was cut off at the mud-line at the time the latter was abandoned.[22] Textrin's standard procedure was to cut off abandoned wells at the mud-line.[23] In the case of GBM–1X, however, this procedure was not followed because it was believed this procedure would have been extraordinarily dangerous.[24]

Because of the unique situation presented by GBM–1X, Textrin officials requested directions from the Trinidadian Harbour Master, who ordered them to mark the well-head with a buoy, to monitor it, and to inform him when it had fallen completely to the sea bed.[25]

Textrin never fully complied with these instructions. Handwritten notes in Textrin's files indicate that the well-head was initially marked with a small, unlighted orange painted buoy[26] which was to have been replaced by a buoy with a winker light in August, 1973.[27] However, the Court finds that Textrin never marked the well-head as reflected in those notes. At least two individuals, who worked in the area, remembered seeing the well-head before it fell[28] but reported that they had never seen

**14.** PX 2 and 3.

**15.** D.I. 64, pp. 33–39; Tr. 92; PX 1, 2 and 3.

**16.** D.I. 64, p. 38.

**17.** Tr. 92–93.

**18.** D.I. 49, pp. 43–44; Tr. 152–53.

**19.** D.I. 46, pp. 46, 64–65; D.I. 49, p. 21.

**20.** D.I. 49, pp. 19–21.

**21.** D.I. 53, pp. 17–20.

**22.** D.I. 53, pp. 13–14; D.I. 49, p. 28.

**23.** D.I. 12, pp. 19–20; D.I. 53, pp. 13–14; D.I. 49, pp. 25–26.

**24.** D.I. 53, pp. 24, 59.

**25.** D.I. 53, pp. 29–30, 50; D.I. 12, pp. 28–29; PX 10.

**26.** D.I. 12, pp. 28–20; D.I. 49, pp. 22–24; D.I. 56, pp. 55–56; PX 10.

**27.** D.I. 53, pp. 25–26, 55–56; D.I. 12, pp. 43–44.

**28.** D.I. 49, p. 23; D.I. 67, pp. 30-31.

a buoy with a winker light marking its location.[29] It is absolutely clear that the location of GBM–1X was not marked by any buoy in December, 1976.[30]

It is also clear that Textrin did not make a good faith effort to monitor the site in order to assure that the well-head remained marked and that it continued to fall to the sea floor.[31] At one point, in an attempted salvage operation, Textrin dispatched divers to determine whether they could remove the flow line running to the well, but the divers never specifically looked for the well-head and did not even follow the flow line to its end because it was buried in the sand.[32] In fact, it would have been a very simple and inexpensive matter for Textrin to have checked the condition of the well-head and to have marked it.[33] Therefore, it is clear that with respect to GBM–1X, Textrin failed to make a good faith effort to comply with the requirements of its lease with Trinidad or the instructions of the Harbour Master and failed to mark the well-head or to make any attempt to determine whether it had fallen to the sea bed.

7. On March 29, 1976, Euro-Pirates and Slater entered into a contract with Atlantic Pacific Marine Corporation wherein Euro-Pirates and Slater agreed to use the Morgan to tow an oil rig, the "Gulf Commander," from Salvador Brazil, to either Trinidad or Louisiana.[34] This contract was performed when the Morgan towed the Gulf Commander to Trinidad in return for $250,-000.[35] In Trinidad, Euro-Pirates then chartered the Morgan to Trinidad-Tesoro Petroleum Corp. Ltd. ("Trinidad-Tesoro") for the purpose of servicing the Gulf Commander, which had also been leased to Trinidad-Tesoro by its owner. The Morgan continued servicing the Gulf Commander until December 6, 1976. Trinidad-Tesoro paid Euro-Pirates $2,500 per day from June 6, 1976 until September 6, 1976, and $3,000 per day thereafter for the charter of the Morgan.[36]

8. On December 6, 1976 between 7:00 and 7:30 A.M., while performing services under the charter to Trinidad-Tesoro, the Morgan was, at a prudent speed, proceeding out of Guayaguayare Bay, which it had previously entered for the purpose of finding sheltered water.[37] The Morgan was under the command of Robert Gold, a qualified and experienced captain.[38] Suddenly, without any indication of danger, the Morgan struck a submerged object[39] which breached its hull and flooded its engines and generator flats.[40] Defendants have conceded that the submerged object which the Morgan struck was the well-head for GBM–1X[41] and, indeed, the evidence supporting this conclusion is overwhelming.[42]

9. The collision and subsequent sinking caused extensive damages to the Morgan. Its hull and other structural components, its entire electrical system, and many mechanical systems, including the main engines and the bow-thruster engines were severely damaged and required extensive repairs.[43] The Morgan was, of course, totally disabled and unable to function as a result of these damages.

10. The damaged Morgan was initially towed to the Swan-Hunter Shipyard in Trinidad, arriving there on December 8,

**29.** D.I. 49, p. 28; D.I. 67, p. 19.

**30.** D.I. 48, pp. 18–19; D.I. 64, p. 79.

**31.** D.I. 12, pp. 30–36, 44–46; D.I. 53, pp. 34–38.

**32.** D.I. 53, pp. 33–34.

**33.** D.I. 49, pp. 36–37; D.I. 67, pp. 6–8; D.I. 12, pp. 69–70.

**34.** PX 135.

**35.** PX 135; Tr. 14–21.

**36.** PX 136, 137A–I; Tr. 14–21.

**37.** D.I. 64, pp. 50–57; 80; D.I. 48, pp. 9–15.

**38.** D.I. 64, pp. 3–15; PX 4 and 36.

**39.** D.I. 48, pp. 5 *et seq.*; D.I. 64, pp. 50–60, 77–79.

**40.** D.I. 64, pp. 60–61; PX 37.

**41.** D.I. 75, p. 1.

**42.** *See* Tr. 152 *et seq.*; D.I. 67; PX 16A–L, 22, 23, 24, 31A–S, 152A–F, 176, 177, 178, and 179.

**43.** PX 24; Tr. 73–74.

1976. Because the Swan-Hunter lacked the capability to repair fully the damages to the Morgan, only temporary repairs, sufficient to prevent further deterioration of the ship and to make possible the towing of the ship to the United States, were effected there. Subsequently, the ship was towed to the Halter Marine Shipyard, in New Orleans, Louisiana, for final repairs.[44] At Halter, the permanent structural repairs were completed by Halter Marine Services, Inc. and the engines were removed and sent to Marine Engineering, Inc., for repairs. Marine Engineering is the repair organization owned by Oosterhuis Industries, the local sales representative for Motoren Werke Mannheim ("MWM"), the German manufacturer of the Morgan's engines.[45]

11. The repair work at Halter was fully and adequately supervised by plaintiffs' own employees and also by trained Marine Surveyors[46] and, consequently, was completed with reasonable dispatch for a job of that magnitude.[47] All repairs were completed and the Morgan was available for use by July 22, 1977, 230 days after the collision.[48]

Defendants contend that the work was unnecessarily prolonged and that all repairs should have been completed within 120 days. First, defendants contend that plaintiffs deliberately slowed work dramatically during the last two months of repairs. The Court finds that the amount of repair work being performed upon the Morgan did drop dramatically in the latter two-month period.[49] However, such a drop is entirely normal at the end of a major repair job because at that time the workmen are waiting for various parts and are tying together loose ends. Thus, the drop in repair work on the Morgan was not caused by any fault of the plaintiffs or by any desire on their part to delay repairs.[50]

Second, defendants contend that the repair period was extended by ten days because of repairs that were performed upon the propellor shaft that had been damaged prior to the collision and had been given a temporary "field" repair. Defendants argue that with this temporary repair the Morgan was seaworthy and under normal circumstances permanent repairs could have been deferred until the next regular drydocking, when repair of the damaged propellor shaft would be necessary in order to obtain recertification of the vessel by the Coast Guard. However, because recertification was required after the repair of the collision related damages, the propellor shaft also had to be repaired while the other damages were being repaired. The repairs to the propellor shaft were performed during the middle of the overall repair period, and although the evidence is not entirely clear, it appears that they were performed simultaneously with other tasks. In any case, in light of the fact that during the last two months other repairs related solely to the collision were delayed by waits for parts, the Court finds that it is highly unlikely that the propellor shaft repairs delayed the overall repairs at all.[51]

The Court thus finds that the entire period of detention was attributable to the repairs necessitated by the collision and that the repairs were completed with normal and reasonable dispatch.

12. Plaintiffs initially claimed substantial damages in this action for all the costs of repairing the damage sustained by the Morgan as a proximate result of its collision with GBM–1X. The portion of their claim covered by their own hull insurance, and paid for by their insurer, however, has been settled, and plaintiffs now seek to recover only certain elements of their claim which

44. D.I. 64, pp. 66–70; PX 24.

45. Tr. 53, 73–74, 184, 186; D.I. 31, pp. 23–25.

46. Tr. 226–230; D.I. 41, pp. 9–17, 23–24.

47. Tr. 166–170, 200–203. *See also* Tr. 224–27, 232–35.

48. Tr. 218.

49. Tr. 186–200.

50. Tr. 200–201.

51. Tr. 166–69, 191–201, 210, 226–27, 230–34.

were not covered by their insurance[52] or for which their insurer refused to pay.

13. Euro-Pirates incurred $25,000 in expense which was the deductible amount of its hull insurance. That sum was paid by Euro-Pirates for repairs to the Morgan for damages directly resulting from the collision with the GBM–1X well-head, and Euro-Pirates has not been reimbursed by insurance for that expense.[53]

14. The Marine Surveyor employed by the insurance company did not approve and the insurance company refused to pay $12,048.50 in expenses charged to plaintiffs by Marine Engineering[54] for overtime labor performed by Marine Engineering mechanics while repairing damages to the Morgan's engines sustained as a result of the collision with Textrin's well-head.[55] The insurance company paid an amount equal to the amount that would have been owed if the labor had been performed at straight time, and thus the amount claimed by plaintiffs represents only the overtime "premium."[56] The overtime, as a practice, was approved by a Euro-Pirates representative in the hopes of speeding up repairs and reducing "down time" for the vessel.[57] The Marine Surveyor refused to approve it only because, as a representative of the insurance company, he was solely interested in minimizing repair costs and was not interested in speeding the work in order to minimize the vessel's "down time."[58]

15. The insurance company also refused to pay $18,979.11 billed to plaintiffs for travel and living expenses incurred by MWM mechanics brought from Germany to repair the damages sustained by the Morgan's engines as a result of the collision.[59] Because of the severity of the damage to the engines, plaintiffs, in response to Marine Engineering/Oosterhuis' suggestion, specifically requested that the mechanics be obtained.[60] The mechanics did come for that purpose and worked on the Morgan's engines.[61] Although the Marine Surveyor overseeing the repairs for the insurer neither approved nor disapproved these casualty-related expenses, the insurer refused to pay them and they were billed to Euro-Pirates.[62]

16. Although both the overtime expenses and the German mechanic's living and travel expenses have been billed to Euro-Pirates, plaintiffs have thus far refused to pay them.[63]

17. Because the Morgan was unable to perform any of its duties under the contract with Trinidad-Tesoro after the collision, Euro-Pirates, in order to honor its contractual obligations and maintain its goodwill, was compelled to move a sister vessel, the M/V Jean Lafitte ("the Lafitte") from Davisville, Rhode Island, to Trinidad to replace the Morgan.[64] The Lafitte left Rhode Island the morning of December 8, 1976 and arrived in Trinidad seven days later during the evening of December 15, 1976.[65] The daily operating costs incurred by the Lafitte during this "mobilization," exclusive of fuel and lubrication, were approximately $1,245.[66] In addition, in the course of the voyage, the Lafitte consumed 47,040 gallons of fuel (burning five gallons per hour per

52. D.I. 77; D.I. 66, ' D.5.

53. Tr. 5.

54. PX 41, 50, 51, 52, and 55.

55. Tr. 78–79, 164–65.

56. Tr. 185–86.

57. Tr. 79–80, 133–35.

58. Tr. 164–65.

59. PX 47, 48 and 49; Tr. 76–77.

60. Tr. 76–77.

61. Tr. 165.

62. *Id.*

63. Tr. 130.

64. Tr. 23–25; PX 102, 105 and 106.

65. Tr. 81.

66. Tr. 81; D.I. 12, pp. 16–26; DX 15.

hundred horsepower[67] and having 5600 horsepower engines[68]) costing $.40 per gallon.[69] Consequently, plaintiffs expended a total of $27,531 to move the Lafitte to Trinidad in order to replace the Morgan.

18. Because of the collision, the Morgan was totally unable to perform work or to earn revenues for the plaintiffs during the period from December 6, 1976 until July 22, 1977. Had it not been detained for repairs during that period, the Morgan would have performed a substantial amount of revenue-generating work. During that same period, two other vessels, virtually identical to the Morgan, the Lafitte and the M/V Calico Jack ("the Jack") worked 71.1% of the time that they were not under repair.[70] The experience of these identical sister ships is highly probative of what the performance of the Morgan would have been had it not been rendered incapacitated by the collision with Textrin's well-head.[71] This finding is supported by evidence presented at trial regarding the nature of the supply boat market in general and evidence that work was, in fact, available.

First, testimony regarding the nature of the oil supply boat business and market conditions in that business during the period of the Morgan's detention made it clear that had the Morgan been available, it is highly likely that it would have had a work experience similar to that of the Lafitte and the Jack. The industry is highly competitive and Euro-Pirates was and is a small business with a number of very large competitors.[72] If the Morgan had been available for work, thus increasing the supply of oil supply boats, the commensurate reduction in demand would have been spread throughout a large market and would not have affected, in any significant respect, the likelihood of a given ship procuring a contract. Therefore, if the Morgan had worked, one could safely find that its work experience would have been similar to that of the Euro-Pirates vessels most similar to it, the Jack and the Lafitte.[73]

In fact, it is highly probable that if Euro-Pirates had had the Morgan available, the overall average performance of its fleet would have been much improved. This is so because of the nature of the market and the way work is procured. The market changes rapidly,[74] and whether or not a company gets a contract often depends upon whether or not one has a ship immediately available and whether or not one has a ship within close geographic proximity of the proposed job.[75] Thus, with an extra ship a company is more likely to have a vessel available and nearby when a lucrative long term contract is proposed. In addition, with fewer ships, flexibility and efficiency is drastically reduced. Euro-Pirates often holds a ship in reserve in order to be able to take advantage of any very lucrative long-term contracts that may become available. It is also often necessary to hold a vessel available for periods of time while waiting for the starting date for contracts to which Euro-Pirates has already committed itself.[76] With fewer ships available a company will be more likely either to refuse some work in order to keep a ship available or to commit

---

67. Tr. 224.

68. PX 146.

69. Tr. 144.

70. DX 3, 4, and 22; Tr. 62–64, 299, 316–17.

71. Tr. 353.

72. Tr. 44–45.

73. Tr. 332–38, 353. Defendants have made much of the fact that a number of market areas were closing down during the period of the Morgan's detention. (Tr. 86, 108–109, 112, 113, 115–16.) This overall reduction in demand would have been felt throughout the market and would have been reflected in the work experience of the Lafitte and the Jack. Because the Court has concluded that the Morgan's experience would have been the same or better than that of the Jack and the Lafitte, had it not been for its detention, and has used the experience of the Lafitte and the Jack to derive the probable experience of the Morgan, the Court has already taken account of the market-wide reduction in demand.

74. Tr. 72–73.

75. Tr. 51.

76. Tr. 70, 113–14, 334–37.

all of its ships and thus have ships unavailable for any more lucrative contracts that may appear.

The Court's finding that the Morgan would have worked during the period it was under repair is reinforced by evidence indicating that there was work available. For example, had the Morgan been able to remain in Trinidad, and had Euro-Pirates' relations with the Trinidadian authorities and Trinidad-Tesoro not been clouded by the disputes following and generated by the collision, the Morgan probably would have found additional work with Trinidad-Tesoro.[77] Similarly, if Euro-Pirates had had the Morgan available in Trinidad, it probably could have underbid its competitors for a tow of the oil rig Western Pacesetter.[78] Plaintiffs have also shown that other work was available which they did not procure for various reasons, including the fact that in some situations they may have been underbid by competitors.[79]

Thus, because of the nature of the market in general and because plaintiffs have demonstrated the existence of specific jobs that were, in fact, available, the Court must find that had the Morgan been available, it would have worked at least as much as the Jack and the Lafitte, and, indeed, it is very likely that with the extra vessel all ships would have been able to work more often and at higher rates. Because the Jack and the Lafitte worked 71.1% of the time that they were not under repairs and because the Morgan was made unavailable by the collision for a period of 229 days, the Court finds that the Morgan would have worked 162.8 days in the period between December 6, 1976 and July 22, 1977, if it were not for the collision with GBM–1X.

19. Had the Morgan worked during the period it was under repair, it would, on the average, probably have earned approximately $2800 per day. This was the Morgan's average gross daily revenue in the year preceding the accident,[80] and the Court has found that it would have continued earning the same average gross daily revenue during the period it was under repair, had it been working. The Morgan was earning $3,000 per day from Trinidad-Tesoro at the time of the accident,[81] and Euro-Pirates was expecting to have the rate raised to between $3,150 and $3,250 per day.[82] However, the fact that many market areas were drying up probably had the effect during that period of holding prices stable. Indeed, during the repair period the Jack was working on a long-term contract at $2,650 per day.[83] Other ships were commanding much higher prices.[84] However, in light of the overall market conditions, it seems probable that the Morgan would have continued to earn $2,800 per day in gross revenues on the average.

20. Although Euro-Pirates did continue to incur a number of fixed costs relating to the Morgan while the Morgan was under repair, it did not, of course, have to incur any operating costs during that period. Although the evidence is conflicting on this issue, the most reasonable estimate of the daily cost of operating the Morgan is $1,245.[85]

21. The Morgan's average net operating revenues, therefore, during the period that it was under repair would have been $1,555 per day.

22. From this, the Court finds that if the Morgan had not struck GBM–1X, it would have earned an additional $253,154 for the plaintiffs during its detention for repairs.

77. Tr. 44–48, 95–98, 117–18, 147–48; PX 108.

78. Tr. 49–60, 120–123; PX 121, 122, and 123.

79. *See* Tr. 60–61, 124–25; PX 114, 116, 118, 119, and 124.

80. Tr. 296; DX 4.

81. Tr. 16.

82. Tr. 45–46.

83. Tr. 106.

84. Tr. 302–306.

85. Tr. 135–47; D.I. 30, pp. 60–61.

## CONCLUSIONS OF LAW

1. The claims presented by this suit are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and this Court has jurisdiction over them pursuant to Article III Section 2 of the United States Constitution.

■ 2. Because the accident giving rise to the claims in this action occurred in the national waters of Trinidad and Tobago ("Trinidad"), this Court must apply Trinidadian law. Section 12 of the Trinidadian Supreme Court of Judicature Act (Act No. 12, 1962)[86] provides that subject to the provisions of any statute enacted on or after March 1, 1848, "the Common Law, Doctrines of Equity, and Statutes of general application of the Imperial Parliament that were in force in England on that date shall be deemed to have been enacted and to have been in force in Trinidad as from that date." Neither party has brought the Court's attention to any Trinidadian statute or case which would be applicable to the facts of this case and the Court therefore concludes that the case is governed by the common law of England.

■ 3. Under the English common law of Admiralty, as a general matter, one who creates a hidden obstruction in navigable waters has a duty to ensure that that obstruction is marked so as to afford adequate warning to mariners. Failure to mark an obstruction constitutes negligence and the party responsible for marking the obstruction will be held liable for any injury to a vessel which, through no fault of its own, collides with the obstruction. *C. Burley, Ltd. v. Edward Lloyd, Ltd.*, 15 Times L.R. 626 (1929); *The Harkaway*, 44 Times L.R. 649 (1928); *Harmond v. Pearson*, 1 Camp. 515, 170 Eng.Rep. 1015 (1808); *see* 4 British Shipping Laws, McGuffie, *The Law of Collisions at Sea* (1961) ("McGuffie") at 79–85. In the early case of *Harmond v. Pearson, supra*, 1 Camp. at 516–17, Lord Ellenborough, finding that the mere posting of a watchman near the spot where a vessel had been sunk was insufficient warning, held:

It is a peremptory law of navigation, that when any substance is sunk in a navigable river, so as to create danger, a buoy shall be placed over it for the safety of the public. This is the proper and specific notice, which all understand and are bound to attend to. A verbal communication may easily be misunderstood, and is very likely (as in the present case) to lead to confusion and mischief. But it is of the utmost importance to the property and the lives of his Majesty's subjects that such a warning should be given as will necessarily inform everyone engaged in the navigation of the river, of the existence of the danger. The defendant is certainly answerable for the consequences of his not causing a buoy to be placed over the wreck of the lighter as soon as possible after it was sunk in the Thames.

While the foregoing rule is not without exception, as noted below, for obstructions which are intentionally placed in navigable waters, such as anchors, *The Harkaway, supra*, McGuffie at 80–81, or mechanical pumping plants, *C. Burley, Ltd. v. Edward Lloyd, Ltd., supra*, the duty to mark is absolute. The case of *C. Burley, Ltd. v. Edward Lloyd, Ltd.*, is particularly relevant and practically indistinguishable from the present case. In *Burley*, the defendants had erected, in the navigable channel of a creek, a pumping plant which was concealed at high tide. Before erecting the pumping plant, defendants had, pursuant to the requirements of an Act of Parliament, obtained a license to do so. In holding defendants liable for injuries suffered by the plaintiffs' ship when it had collided with the pumping plant, the *Burley* Court held that in spite of the existence of the license, defendants had an absolute duty to give navigators "adequate warning of the obstruction."

Defendants here contend that the cases cited above are distinguishable because they apply only to obstructions in navigable rivers where navigation is confined to a narrow channel and do not apply to obstructions in open water such as the Atlantic

**86.** D.I. 74A, ' 1.

Ocean. The Court finds this contention wholly without merit. The proffered distinction or a similar one has been argued in other cases but has never been accepted by an English court. *See White v. Crisp*, 10 Ex. 312 (1854); *Brown v. Mallett*, 5 C.B. 599, 136 Eng.Rep. 1013 (1848). Indeed, in *White v. Crisp, supra*, 5 C.B. at 320, the Court specifically rejected the contention that the sole fact that an obstruction is "lying in a part of a navigable channel not ordinarily passed over by vessel except during stress of weather" removes the duty of the person responsible for the obstruction to mark it.

4. As mentioned earlier, the duty to mark an obstruction in navigable water is not without exception. Defendants have invoked two of those exceptions in the present case.

■ The first exception invoked by defendants here arises when a vessel is sunk without any negligence on the part of its owner or his servants and the owner has completely abandoned possession and control of the sunken vessel. In such a case, the owner has no duty either to remove or to mark the wreck. *Brown v. Mallett*, 5 C.B. 599, 136 Eng.Rep. 1013 (1848); *see The Snark*, [1900] A.C. 105; *White v. Crisp*, 10 Ex. 312 (1854); McGuffie at 79–80. However, this exception does not apply where the original sinking was caused by negligence on the part of the owner or his servants or where possession of or control over the vessel has not been relinquished. In such cases the owner must either adequately mark or remove the wreck. *The Snark, supra; White v. Crisp, supra*; McGuffie, *id.*

■ The Court finds this first exception inapplicable in this case for four independent reasons. First, the exception applies only to sunken vessels whose loss was unintentional and worked a hardship on the owner. It has never been applied to other immobile obstructions which have been intentionally placed in navigable waters, such as anchors, pumping plants or well-heads. Secondly, Textrin never abandoned control and possession of the well-head. Indeed, under the requirements of Textrin's lease with Trinidad and under the explicit instructions of the Trinidadian Harbour Master, abandonment could not occur until the well-head was cut off at the mud line, or, in the special circumstances of this case, until the well-head had fallen completely to the bottom of the sea. Thirdly, the original sinking was caused by an initial negligent act—the striking of the well-head by the drilling rig. Finally, in any case, the Court would refuse to find the exception applicable to the facts of this case where Textrin's alleged abandonment and its failure to mark the well-head contravened the express instructions of the Harbour Master.

■ 5. The Court also finds that defendants may not avail themselves of the second exception they invoke. This second exception to the general rule requiring the marking of wrecks by the owner applies in cases where a ship is sunk in a harbour where the harbour master has the legal authority to mark wrecks within the harbour and where a request has been made of the harbour master to mark the wreck and he has accepted this responsibility. In such a case, the owner of the vessel is wholly relieved of his duty to mark the wreck and will not be held liable for collisions caused by inadequate marking or no marking. *The Utopia*, [1893] A.C. 492; *The Douglas*, 7 P.D. 151 (1882).

■ This exception is inapplicable to Textrin for two independent reasons. First, defendants have failed to show that the Trinidadian Harbour Master had the authority to assume responsibility for either removing or marking the well-head. Secondly, it is clear that the Harbour Master did not assume such responsibility but clearly placed that responsibility upon Textrin.

6. For the foregoing reasons, the Court concludes that Textrin had an absolute duty either to remove the well-head at the mud line or to mark it so as to give clear warning to mariners of the hidden danger. Because Textrin clearly failed to perform this duty, it was negligent and this negligence proximately caused the collision and the damages resulting therefrom.

7. No evidence has been introduced showing any negligence on the part of Texaco, Inc. and no evidence has been introduced on the basis of which this Court could attribute Textrin's negligence to Texaco, Inc. Therefore, the Court concludes that Texaco, Inc. is not liable to plaintiffs in any respect.

■ 8. Defendants contend that plaintiffs were themselves negligent and that their negligence contributed to or caused the accident. Specifically, defendants contend that plaintiffs failed to seek local information regarding hazards to navigation, in particular, Notices to Mariners, with which they could update their charts. Defendants further contend that a failure to seek such information constitutes negligence and that if plaintiffs had made diligent efforts they would have discovered the existence of the well-head and would have avoided the collision.

Even assuming that a failure to seek such local information would amount to negligence, this contention must fail because it is simply unsupported by the record. This Court has found that plaintiffs made diligent efforts to apprise themselves of local hazards—obtaining the most up-to-date charts, arranging to have all Notices to Mariners sent to them, and even consulting with the local harbour authorities. The Court has also found that even the most diligent Mariner would have been unable to obtain any information regarding the location of Textrin's well-head because that information was simply unavailable. Therefore, the Court concludes that plaintiffs were in no way contributorily negligent.

9. Consequently, Textrin's negligence is solely responsible for the damages suffered by plaintiffs as a proximate result of the Morgan's collision with Textrin's well-head and Textrin is liable for 100% of the damages.

■ 10. In determining damages in cases involving maritime collisions, the British Admiralty Courts apply the principle of *restitutio in integrum*—the right to full and complete indemnity. The object of an award of damages in such cases is to place the owner of the damaged ship, who is without fault himself, in the same or nearly the same pecuniary position as he would have been but for the collision. The Admiralty rule is identical to the ordinary rule for determining damages applicable in all cases arising out of tortious behavior. *The Soya*, [1956] 1 Lloyd's List L.R. 557; *The Argentino*, 13 P.D. 191 (1888); *The H.M.S. Inflexible*, [1857] Swab. 200; McGuffie, at pp. 337–38.

■ 11. The burden of proving damages rests with the plaintiff and he must prove two elements. He must provide both proof of actual loss and reasonable proof of the amount of the loss. *The Clarence*, 3 W.Rob. 283, 166 Eng.Rep. 968 (1850); McGuffie, at pp. 344–47.

■ 12. As a normal matter, damages are allowed for the loss of use suffered by a damaged vessel during the period of its detention for repairs. The rationale behind this general rule was set out at length in *The Argentino*, 13 P.D. 191, 201 (1888):

A collision at sea caused by the negligence of an offending vessel is a mere tort, and we have only therefore to consider what has been in the particular case its direct and natural consequence. This consequence (in the case of an innocent ship which is disabled by an accident) is that its owner loses for a time the use which he otherwise would have had of his vessel. There is no difference in principle between such a loss and the loss which the owner of a serviceable threshing-machine suffers from an injury which incapacitates the machine, or the loss which a workman suffers who is prevented from earning money by the wrongful detention of plant which cannot at once be replaced. A ship is a thing by the use of which money may be ordinarily earned, and the only question in case of a collision seems to me to be, what is the use which the shipowner would, but for the accident, have had of his ship, and what (excluding the element of uncertain and speculative and special profits) the shipowner, but for the accident, would have

earned by the use of her. It is on this principle alone that it is habitual to allow in ordinary cases damages for the time during which the vessel is laid up under repair in addition to the cost of the repairs themselves.

*Accord, The Hebridean Coast,* [1960] Lloyd's List L.R. 227, 240; McGuffie, at pp. 381–82; *see The Naxos,* [1972] 1 Lloyd's L.R. 149; *The World Beauty,* [1969] 1 Lloyd's L.R. 350; *The Pacific Concord,* [1960] 2 Lloyd's L.R. 270; *The Soya,* [1956] 1 Lloyd's List L.R. 557.

This general rule does not, however, relieve the shipowner of his burden of proving actual loss and the amount of the loss. The burden is on him to show, to a reasonable certainty, (1) the extent to which his vessel was thrown out of employment, and (2) the fair earnings that the vessel would have made, excluding uncertain and speculative profits. *The Argentino, supra,* 13 P.D. at 201–202. Thus, failure by the plaintiff to adduce sufficient credible evidence showing that the vessel probably would have been employed and the probable extent of that employment will defeat a claim for damages for detention. *The Clarence, supra; see The Argentino, supra,* 13 P.D. at 204. The same is true if the plaintiff fails to adduce sufficient credible evidence regarding the operating revenues and expenses of the damaged craft. *The Hebe,* 2 W.Rob. 530 (1847).

The evidentiary burden on the plaintiff is, however, not a heavy one. The British Courts have repeatedly refused to adopt a hard and fast rule for the method to be used in determining detention damages or the type of evidence which may be considered. *The Naxos, supra,* [1972] 1 Lloyd's L.R. at 155–56; *The Hebridean Coast, supra,* [1960] 1 Lloyd's List L.R. at 239–41; *The Argentino, supra,* 143 P.D. at 202–203. The amount of lost earnings is a question of fact which must be determined by consideration of "all the circumstances, and, in particular, . . . what the owner would probably have been able to do with the ship during the period of detention." *The Hebridean Coast, supra,* [1960] 1 Lloyd's List L.R. at 239.

In order to prove that employment was lost, it is not necessary that a plaintiff show a specific charter or voyage that was lost. Rather he need only produce credible evidence showing that "the vessel would probably have earned a profit during the period of detention." *The Hebridean Coast, supra,* [1960] 1 Lloyd's List L.R. at 239; *The Argentino, supra,* 13 P.D. at 202–203.

Similarly, the British Courts have approved of and employed a wide variety of tests to determine the probable daily earnings that were lost during a vessel's detention. *See The Naxos, supra; The World Beauty,* [1969] 1 Lloyd's L.R. 350; *The Hebridean Coast, supra; The Pacific Concord, supra;* McGuffie at 388.

In assessing the evidence it must always "be borne in mind that the party condemned to pay damages is, legally speaking, a wrongdoer, and that full compensation is due." *The H.M.S. Inflexible, supra,* [1857] Swab. at 205.

13. Plaintiffs in this case have clearly discharged their burden of proving the first element of detention damages—loss of probable employment. In this regard, the plaintiffs produced evidence of the work experience during the detention period of vessels identical to the Morgan as well as evidence of market conditions which showed that the addition or loss of a single vessel would have had little or no effect upon overall demand. They have also produced evidence regarding the work experience of the Morgan before and after the casualty and have produced evidence of specific jobs which might or might not have been obtained had the Morgan been available. This evidence is more than ample, and the Court has concluded from it that were it not for the collision, the Morgan would have worked 71.1% of the time that it was under repair, or 162.8 additional days.[87]

---

87. Defendants contend that, nevertheless, under "the spare boat doctrine" plaintiffs are precluded from recovering any detention damages. They argue that under that doctrine, "a vessel

14. Plaintiffs have also clearly discharged their burden of proving the second element of detention damages. They have proven what the net daily earnings of the Morgan would have been during the detention period by adducing evidence of the Morgan's earnings both before and after the casualty, evidence of the earnings of identical sister vessels during the period of the casualty, and evidence of the Morgan's operating expenses. From this evidence the Court has concluded that the Morgan would have produced net operating revenues of $1,555 per day for the plaintiffs.

15. Defendants contend that Textrin should be held liable only for the earnings lost by the Morgan during the first 120 days of its detention because if the repairs had been effected with due diligence and had not been delayed by propellor shaft repairs unrelated to the collision they should have been completed within that time. The Court disagrees.

The period for which compensation for profits lost during detention must be made, in these circumstances, runs from the time that the vessel was first damaged and thereby thrown out of work until the time when, with due diligence, the repairs made necessary by the collision ought to have been completed. *The H.M.S. Inflexible, supra*, [1857] Swab. at 205; McGuffie, at 388–99. The Court has found that repairs were carried out with due diligence and that the repair period was not increased by repairs unrelated to the casualty. Therefore, Textrin must compensate plaintiffs for all net revenues that the Morgan would have earned during the entire period of its detention. Because the Court has determined that the Morgan would have worked 162.8 days during the period of its detention, Textrin must compensate plaintiffs for all net revenues which the Morgan could have earned in that time, a total of $253,154.

16. Under the basic principle of *restitutio in integrum* the innocent owner of a damaged vessel is also entitled to compensation for out-of-pocket expenses incurred as a proximate result of a collision. McGuffie at 370. Consequently, the owner is entitled to compensation for the costs of repairs. *The H.M.S. Inflexible, supra*, [1857] Swab. at 204. He is entitled to have his ship fully and completely repaired even if the value of the vessel is thereby increased. *The Hebe*, 2 W.Rob. 530, 536 (1847); McGuffie at 529–30. However, these repairs must be effected at a reasonable and proper cost and if the charges exceed such a rate the cost credited to the owner must be reduced. *The H.M.S. Inflexible, supra*, [1857] Swab. at 202–203; McGuffie at 530. In this regard, though, the "wrongdoer has no right to dictate how the repairs shall be effected . . . [and] if the work has on the whole been reasonably done . . . a bill ought not to be reduced on the grounds that the work has not been carried out according to some ideal standard." McGuffie at 530.

17. A wrongdoer is liable for the cost of repairs even if the owner has not paid their cost. For example, it has been held that an owner is precluded from recovering his vessel's detention losses suffered as a result of a collision, where during the period of detention, such owner had similar vessels available for work, but due to a lack of demand for his vessels, were in fact not working," *citing Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932) and *Sabine Transp. Co. v. SS Esso Utica*, 1955 AMC 2102 (E.D.Tex.1955). Defendants have misstated the spare boat doctrine, which allows the award of detention damages to an owner who maintains a spare boat for the purpose of substituting it for disabled vessels. The doctrine is obviously inapplicable to the facts of this case. However, defendants apparently rely on the principle, enunciated in those cases, that detention damages will not be allowed where the damaged vessel would not have worked even if there had been no casualty. The American authorities relied upon by defendants apply the same rules for determining detention damages as do the English authorities cited by this Court. The existence of boats without work is a circumstance that should be considered in determining whether or not work was actually lost. However, the fact that at various times one or more of plaintiffs' other vessels may have been available for a brief period during the detention period does not alter the Court's conclusion. This fact was considered with all of the others by the Court in its determination that the Morgan would have been employed during 71.1% of its detention period.

owner who has become bankrupt since the time the repairs have been effected and has not and will not pay the cost of those repairs is, nevertheless, entitled to compensation for their cost. *The Endeavor*, 6 Asp. 511 (1890); McGuffie at 377–78. This rule is based on the rationale that the wrongdoer is responsible for fully compensating the owner for damages to the ship and the cost of repairs is merely the measure of those injuries. Thus, the failure of the owner to actually make those repairs or to pay for the repairs himself is irrelevant.

18. The owner of a damaged ship has a correlative duty to act reasonably to mitigate his losses and if he fails reasonably to mitigate he is not entitled to compensation for any damage he may suffer as a result of that failure. In judging whether a plaintiff did act reasonably to mitigate his losses the standard to be applied is the course of activity which would be expected of a prudent uninsured shipowner in the plaintiff's situation. An uninsured shipowner in this context is one who is not entitled to be indemnified by anyone against the loss and therefore is bound to bear it himself. *The Ferdinand Retzlaff*, [1972] 2 Lloyd's L.R. 120, 123; McGuffie, at 340.

19. In light of the foregoing principles of law, it is evident that Textrin is liable to the plaintiffs for all three of the repair-related expenses claimed by plaintiffs and not paid for by their insurance carrier: (a) the $25,000 "deductible" amount paid by Euro-Pirates for repairs to the Morgan (the "deductible expense"); (b) the $12,048.50 in expenses billed to plaintiffs, but not paid by them, for overtime labor performed by laborers repairing the Morgan (the "overtime expenses"); and (c) the $18,979.11 billed to the plaintiffs but not paid by them for travel and living expenses incurred by German mechanics who aided in the repair of the damage to the Morgan's engines suffered as a result of the collision (the "German Mechanic expenses").

There is no question that the deductible expense was necessary, reasonable and related to the casualty. The overtime expenses and the German Mechanic expenses were also clearly related to repairs of the casualty. Defendants, however, contend that they should not be obligated to pay for these expenses because they were unreasonable and because plaintiffs have not paid their bills and therefore have not been harmed. Nonpayment of the repair expenses by the shipowner under the prevailing law clearly does not relieve the wrongdoer of his primary obligation to pay for those expenses and, therefore, that contention must be rejected. The Court also finds that the two categories of expense were entirely reasonable. The overtime expenses, although higher than normal, were incurred in the hopes of minimizing detention damages and because they are the types of expenses that would be incurred by a prudent uninsured shipowner, they must be allowed. The German mechanics were brought over at the suggestion of the organization repairing the engines. The Court finds the plaintiffs' reliance on this suggestion reasonable and therefore concludes that Textrin will also be liable to plaintiffs for this expense.

20. Damages must also be allowed plaintiffs for the additional costs they incurred in moving the Lafitte from Rhode Island to Trinidad to replace the Morgan. These were out-of-pocket expenses directly caused by the collision. But for the collision, the Morgan would have continued working in Trinidad and the Lafitte would have remained in Rhode Island. Therefore, Textrin is also liable for the $27,531 expended by plaintiffs in moving the Lafitte from Rhode Island to Trinidad.

21. The final item of damages sought by plaintiffs is prejudgment interest on the damages awarded. They contend that they are entitled to interest on the damages at a rate equivalent to their actual average cost of borrowing from May 1, 1977, the midpoint of the time when the Morgan was out of service, through the date of judgment.

In both English and American Admiralty practice, although the award of prejudgment interest is within the firm dis-

cretion of the court, it is the normal procedure to award prejudgment interest and prejudgment interest should be awarded in the absence of exceptional or peculiar circumstances. The basic principle of *restitutio in integrum* militates in favor of such an award in most cases. Generally, were it not for the collision, the shipowner would have had the use of the money which he expended for repairs or which he did not receive in profits; and he would have been able to invest that money at interest. Therefore, in order to make him whole, he is entitled to an award of prejudgment interest. *The Hebe, supra*, 2 W.Rob. at 536–37; *United States v. Motor Vessel Gopher State*, 614 F.2d 1186 (C.A.8, 1980); *Sabine Towing and Transportation Company, Inc. v. Zapata Ugland Drilling, Inc.*, 553 F.2d 489 (C.A.5), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977); *Gardner v. The Calvert*, 253 F.2d 395 (C.A.3), *cert. denied*, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); *Signal Oil & Gas Co. v. The Barge W–701*, 468 F.Supp. 802 (E.D.La.1979); *Samincorp. v. S.S. Rivadeluna*, 277 F.Supp. 943 (D.Del. 1967); *see Funabashi Sycamore Steamship Co., Ltd. v. Owners of the Steamship White Mountain*, [1972] 2 All.E.R. 181, [1972] 1 Lloyd's L.R. 371.

■■■ 22. The rate of prejudgment interest that is to be awarded is also within the firm discretion of the court and should be set with regard to the particular circumstances of the case. The legal rate of interest prevailing in the forum state may be considered, but the district court should endeavor to take account, to the greatest extent possible, of the prevailing interest rates and the actual cost to the plaintiff of borrowing money. *See United States v. Motor Vessel Gopher State, supra; Sabine Towing and Transportation Company, Inc. v. Zapata Ugland Drilling, Inc., supra; Gardner v. The Calvert, supra*, 253 F.2d at 402–403; *Signal Oil & Gas Co. v. The Barge W–701, supra*, 468 F.Supp. at 816–17.

23. Plaintiffs attempted to introduce evidence showing their actual cost of borrowing.[88] However, the Court finds that the evidence tendered is all inadmissible hearsay and therefore cannot be considered.

■■■ Plaintiffs' proof consisted of the testimony of their former chief financial officer, Mr. Frank Herman Puglisi, and two documents. Mr. Puglisi testified that, for the purpose of determining plaintiffs' cost of borrowing money for two of the years, he gathered the relevant documents and data, sent that data to an accountant, and instructed the accountant as to how the cost of borrowing should be derived. Plaintiffs attempted to prove that cost by the introduction of the letter sent to Mr. Puglisi in response by the accountant, without any testimony by the accountant and without the submission of any of the underlying documents and other data. Plaintiffs sought to prove the cost for a third year by submitting a document containing figures derived in an identical way by Mr. Puglisi's subordinates. These figures were not compiled in the normal course of business and were supported by neither the underlying data nor the testimony of anyone who actually derived the figures. Finally, the rate for the fourth year was submitted by plaintiffs in a post-trial brief with no supporting evidence whatsoever. It is clear that all of this evidence is hearsay and does not fall within any of the exceptions of the hearsay rule. Therefore the Court finds itself without any admissible evidence regarding plaintiffs' actual cost of borrowing money.

■■■ 24. Because of plaintiffs' failure to prove their cost of borrowing money, the Court has determined that the best course would be to award prejudgment interest at the legal rate for the forum state, the State of Delaware.

The legal rate of interest in the State of Delaware is set in 6 *Del.C.* § 2301(a), as amended April 23, 1980 (Senate Bill 519), which provides in relevant part:

> Where there is no expressed contract rate [of interest], the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as

---

**88.** PX 153 & 155; D.I. 72, pp. 9–11.

of the time from which interest is due; provided that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time.

In the present case, the time from which interest was due predates April 18, 1980 and therefore the legal rate of interest is the rate that prevailed on July 22, 1977, the date from which the Court has determined, *infra*, that interest ought to run. That rate was set by 6 *Del.C.* § 2301(a), before that statute was amended on April 23, 1980 (Senate Bill 519), at 6% *per annum*.

█ 25. In light of the foregoing conclusions of law, the Court finds that the plaintiffs are entitled to prejudgment interest on all portions of the damages where they have actually suffered the loss of use of some sum of money, either in the form of out-of-pocket expenses or lost income. They are not entitled to prejudgment interest on the German mechanic expenses or the overtime expenses because they have not paid for those expenses and consequently have not lost the use of any money.

Interest shall run on all other portions of the damages awarded, a sum of $305,685, at the rate of 6% *per annum* from July 22, 1977, the date upon which the repairs on the Morgan were completed, until the date judgment is entered. From the evidence it is impossible to determine exactly when each particular element of loss was sustained. Therefore, the Court, in the exercise of its discretion, has chosen the date upon which repairs were completed as the date from which interest should run because, in fairness, that date probably represents the date upon which, on the average, the losses would have been felt by plaintiffs.

26. Postjudgment interest will be awarded at the rate of 5% over the Federal Reserve discount rate on the day upon which judgment is entered as provided by Delaware law. *See* 28 U.S.C. § 1961; *Missouri-Kansas Pipe Line Co. v. Warwick*, 22 A.2d 865 (Del.Sup.Ct.1941); 6 *Del.C.* § 2301(a) (as amended April 23, 1980 by Senate Bill 519).

27. Judgment will be entered in favor of plaintiffs and against defendant, Texaco Trinidad, Inc., in the following amounts:

(a) $336,712.61, plus

(b) prejudgment interest on the sum of $305,685, running from July 22, 1977 up to and including this date at the rate of 6% compounded annually, plus

(c) postjudgment interest on the total of the sums in paragraphs 1(a) and 1(b) from this date at the rate of 5% over the Federal Reserve discount rate on this date, and

(d) suit costs.

Judgment will be entered in favor of Texaco, Inc. and against plaintiffs.