**ROSE HALL, LTD., Plaintiff,**

v.

**CHASE MANHATTAN OVERSEAS BANKING CORPORATION and Holiday Inns, Inc., Defendants.**

Civ. A. No. 79–182.

United States District Court, D. Delaware.

June 10, 1983.

Andrew B. Kirkpatrick, Jr., Paul P. Welsh, Thomas Reed Hunt, Jr., Francis S. Babiarz and Denison H. Hatch, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff.

Charles S. Crompton, Jr., David B. Brown and Gregory A. Inskip, Potter, Anderson &

Corroon, Wilmington, Del., of counsel: Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Overseas Banking Corp.

Henry N. Herndon, Jr., Morris, James, Hitchens & Williams, Wilmington, Del., of counsel: Ronald L. Reid and Peter Q. Bassett of Alston & Bird, Atlanta, Ga., for defendant Holiday Inns, Inc.

## OPINION ON ENTRY OF JUDGMENT

MURRAY M. SCHWARTZ, District Judge.

This opinion addresses the entry of judgment on a special verdict pursuant to Fed. R.Civ.P. 49(a). After deliberating for seven and one-half days, a jury, which sat through 81 trial days and what turned out to be 15,564 transcript pages of proceedings, returned its special verdict on March 17, 1983. Entry of judgment was deferred for thirty days at the request of counsel. At the end of that period, the parties submitted their proposed forms of judgment.[1]

■ The function of a Court in the present procedural posture—entry of judgment on a special verdict—is narrow. Its task is to apply the law to the facts as found by the jury and translate the same into a judgment. *See* 5A J. Moore, *Moore's Federal Practice* ¶ 49.02, p. 49–8 (2d ed. 1982). The instant matter is unusual in that two of the three litigants insist that the special verdict entitles each to judgment against the other. In addition to the entry of a judgment on the special verdict, the parties agreed other issues should be determined by the Court as part of the judgment. Falling into the latter category are two issues which only arise if judgment is entered for plaintiff. These issues include: first, the currency of the jury award, if any, and its adjustment to reflect the difference and decline of the value of the Jamaican dollar against the United States dollar;[2] and second, whether and to what

---

1. Following submission of the proposed forms of judgment, but prior to entry of judgment, the presiding trial judge, the Honorable Edwin D. Steel, Jr., became seriously ill and unable to discharge his judicial duties. On May 5, 1983, pursuant to Fed.R.Civ.P. 63, the case was assigned to Judge Murray M. Schwartz.

2. Throughout this opinion, figures representing United States dollar amounts will be referred to as "US$." Figures referring to Jamaican dollar amounts will be referred to as "J$."

extent prejudgment interest, if any, is to be awarded to plaintiff. Also involved at a peripheral level are treatment of the so-called outparcels and assessment of costs. These matters will be considered seriatim. In order to understand the special verdict sheet, which will be produced in full at a later portion of this opinion,[3] a background statement is essential.

## BACKGROUND

Plaintiff, Rose Hall Ltd. ("Rose Hall" or "plaintiff"), is a Cayman Islands corporation whose ultimate principal and controlling stockholder is John W. Rollins, Sr. Rose Hall owned approximately 5500 acres of land on the north coast of Jamaica near Montego Bay. In the late 1960's, Rose Hall organized a wholly owned subsidiary company called Rose Hall (H.I.) Ltd. ("Rose Hall (H.I.)") for the purpose of owning a hotel in Jamaica to be known as the Rose Hall Holiday Inn. The hotel property owned by Rose Hall (H.I.) consisted of the hotel building and an 11 acre tract of land cut out from the Rose Hall acreage. The hotel was financed by a US$6,250,000 loan from the Bank of Nova Scotia ("BNS") to Rose Hall (H.I.) and leased to a subsidiary of Holiday Inns for a twenty year term but guaranteed by defendant Holiday Inns, Inc. ("Holiday Inns").

Chase Merchant Bankers Jamaica, Ltd. ("Chase Jamaica") is a wholly owned subsidiary of defendant Chase Manhattan Overseas Banking Corporation ("CMOBC"), which in turn is a wholly owned subsidiary of Chase Manhattan Bank, N.A., a wholly owned subsidiary of the Chase Manhattan Corporation. On June 3, 1974, Rose Hall borrowed US$3,000,000 from Chase Jamaica. As security for the loan, Rose Hall gave Chase Jamaica a first mortgage on approximately 3000 acres of Rose Hall's land, lying largely in the middle of the 5500 acre assemblage, a second mortgage on the Rose Hall Holiday Inn and a pledge of all the shares of Rose Hall (H.I.). The parties to the loan agreed that certain of the 3000 acres described in the mortgage, called the "outparcels," were not intended to be cover-

ed by it, and would be released to Rose Hall at any time upon request. This agreement is embodied in a letter from Chase Jamaica to the Rose Hall Directors, dated May 10, 1974. (Plaintiff's Exhibit ("PX") 472).

Rose Hall quickly went into default on its loan from Chase Jamaica. By mid-1975 Rose Hall (H.I.) had entered into negotiations for the sale of the hotel to the Urban Development Corporation ("U.D.C."), a corporation owned by the Jamaican government. John Rollins negotiated principally with Moses Matalon, who between 1975 and 1977 was the Chairman of the U.D.C. By May or June 1976, those negotiations had crystallized into a tentative arrangement with the Jamaican government. The hotel and the 11 acres on which it was situated would be sold to U.D.C. for US$13,000,000, payable in US$10,000,000 cash and US$3,000,000 in long-term Jamaican government guaranteed debentures. The US$10,000,000 cash was to be loaned by BNS to the Jamaican government. From the sale proceeds, BNS was to receive US$6,250,000 to pay off the existing mortgage and US$2,625,000 toward other obligations owed to BNS by Rollins entities. Chase Jamaica was to receive US$1,125,000 cash toward repayment of its loan, and the US$3,000,000 in debentures were to be available for repayment of the remainder. In exchange, BNS and Chase Jamaica were to release their previously existing security interests in the hotel with the Jamaican government providing security sufficient to satisfy BNS.

As the sale negotiations continued, Rose Hall fell further behind in payments due under the Chase Jamaica loan. In early 1976, Chase Jamaica, as pledgee of the shares, registered the stock of Rose Hall (H.I.) in its name and became involved in the sale negotiations.

Holiday Inns learned of the sale negotiations in approximately April 1976, and, desiring to modify the terms of the lease with Rose Hall (H.I.) which it considered oppressive, held discussions with John Rollins and Jamaican government representatives.

3. *See infra* p. 1564.

Plaintiff contended that these discussions embodied: first, threats to breach its lease unless it was granted concessions; second, false and malicious statements that Rose Hall (H.I.) had misrepresented its earnings to the government; and third, assertion of a false claim that Rose Hall (H.I.) owed Holiday Inns approximately US$4 million previously spent by the lessee for maintenance and repair of the hotel. Without specifying which allegation formed the basis for its finding, the jury implicitly concluded that Holiday Inns wrongfully interfered with the Rollins negotiated proposed US$13,000,000 sale to U.D.C. and thereby caused Rose Hall US$4,500,000 in damages.[4]

During the spring and summer of 1976, political and economic conditions in Jamaica deteriorated. Under Prime Minister Michael Manley, leader of the People's National Party ("P.N.P."), the government moved to the left in foreign and domestic policy and created widespread apprehension, flight of capital, and political violence on the island. This culminated in the declaration of a national State of Emergency on June 19, 1976. As a result, tourism and resort development declined dramatically.

In early August, 1976, Chase Jamaica informed Holiday Inns that it was the owner of the Rose Hall (H.I.) shares, and arranged a meeting for August 20, 1976 in Miami, Florida. This meeting formed the basis of conspiracy claims by plaintiff against the defendant Holiday Inns. Rose Hall alleged that Chase Jamaica and Holiday Inns conspired to frustrate the consummation of the US$13,000,000 arrangement and replace it with a sale at a drastically reduced price, thereby accomplishing objectives beneficial to themselves without regard to Rose Hall's interests. The jury, however, found that there was no such conspiracy.[5]

In late August, 1976, the U.D.C. formally notified Rose Hall (H.I.) that it was no longer interested in pursuing the US$13,-000,000 negotiations. On September 14, 1976, Chase Jamaica made a proposal far more attractive to the U.D.C. Instead of US$13 million for the hotel only, Chase Jamaica offered to sell to the U.D.C. all of the Rose Hall collateral for approximately US$9.5 million, consisting of US$8.5 million for the shares of stock of Rose Hall (H.I.) and US$1 million for the 3000 acres of mortgaged land. The U.D.C. accepted the offer in late September or early October, 1976, with closing taking place on November 18, 1977. In this action, plaintiff alleged and the jury found that this sale was unreasonably "cheap"[6] and in violation of Chase Jamaica's mortgagee duties, determining that, as a result, plaintiff was damaged in the amount of US$1,500,000 for the cheap sale of the land and US$0 for the shares of Rose Hall (H.I.).[7]

The title conveyed by Chase Jamaica to the U.D.C. included the outparcels. After the sale, the U.D.C. and Chase Jamaica agreed that the U.D.C. would honor Chase Jamaica's obligation to release the outparcels. Although efforts are being made by Rose Hall and the U.D.C. to accomplish this reconveyance, problems relating to boundary determination have impeded progress. In this proceeding, plaintiff has requested that the Court issue a declaratory judgment that if the U.D.C. fails to reconvey the outparcels by October 1, 1983, CMOBC is liable to Rose Hall for resulting damages.

On September 21, 1976, Rose Hall representatives requested Chase Jamaica to permit Rose Hall (H.I.) to bring a lawsuit in Georgia against Holiday Inns for interference with the US$13,000,000 arrangement. Rose Hall representatives also requested that Chase Jamaica withdraw its offer of sale to the U.D.C. In December, 1976, a lawyer for the Jamaican government requested that Chase Jamaica sell the assets of Rose Hall (H.I.) instead of its shares. Chase Jamaica refused these proposed

**4.** *See* Interrogatory Nos. 2 and 6, *infra* p. 1564, and discussion *infra* pp. 1564–65.

**5.** *See* Interrogatory No. 5, *infra* p. 1564.

**6.** Throughout the course of this litigation, the colloquialism "cheap" has been used to de-

scribe the sale of the land at less than the best available price.

**7.** *See* Interrogatory Nos. 1 and 6, *infra* p. 1564.

courses of action and subsequently consummated its US$9.5 million sale to the U.D.C. of Rose Hall (H.I.) stock and 3000 acres of land. By selling stock rather than the hotel asset, Chase Jamaica effectively made the interference claim against Holiday Inns unavailable to plaintiff. Rose Hall sued Holiday Inns in Georgia for wrongful interference with the US$13,000,000 sale negotiations on September 30, 1976. The Georgia court held, without determining the merits of the interference claim, that such a suit could only be brought by Rose Hall (H.I.). *Rose Hall, Ltd. v. Holiday Inns, Inc.,* C.A. No. C227–30 (Ga.Super.Ct., Fulton Cty., filed Sept. 30, 1976), *aff'd,* 146 Ga.App. 709, 247 S.E.2d 173, *cert. denied,* No. 55491 (Ga. Oct. 3, 1978). In effect, the Georgia court confirmed the unavailability of the interference claim. The jury found that Chase Jamaica wrongfully prevented Rose Hall from suing Holiday Inns in the Georgia action, and as a result plaintiff suffered US$4,500,000 in damages.[8]

On October 4, 1976, Rose Hall filed an action in the Supreme Court of Judicature of Jamaica to enjoin the sale of stock and land by Chase Jamaica to the U.D.C. and, alternatively, for damages. Plaintiff represented to the Jamaican court that its "damages could be quantified at about $10,000,-000." *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.,* Suit No. E–211 of 1976, (Sup.Ct. of Judicature of Jam., Jan. 17, 1977). (PX 140, p. 14). The Jamaican court refused to enjoin the sale on the ground that monetary damages would be an adequate remedy if Rose Hall succeeded in proving its case at trial. In the instant action, the plaintiff contended, and the jury found, that the defeat of the injunction was caused by misrepresentations to the Jamaican court made by representatives of Chase Jamaica to the effect that it would be financially able to meet any dam-

age liability in view of the the permanence of its Jamaican operation and its affiliation with the other Chase entities. There was evidence that at the time these representations were being made, actual undisclosed plans to close down Chase Jamaica's operation existed.[9] By February 1978, Chase Jamaica's office closed and ceased active business.

In mid-1980, the Jamaican court listed the Jamaican action for trial in January, 1981. Rose Hall moved to stay the Jamaican action pending resolution of the Delaware action. CMOBC opposed the stay and offered to pay any final judgment that might be entered against Chase Jamaica to the extent of J$10,000,000, subject to certain conditions. The Jamaican court, noting that CMOBC's offer was so conditional as to be "worthless," granted the stay of the proceedings. *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.,* Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam., Feb. 12, 1981) (PX 141, p. 21). On Chase Jamaica's appeal, the Court of Appeal of Jamaica affirmed the granting of the stay. *Chase Merchant Bankers Jamaica Ltd., et al. v. Rose Hall Ltd., et al.,* Sup.Ct. Civil Appeal No. 78/80, (Ct. of Appeal, Jam., June 23, 1982) (PX 641). Chase Jamaica then appealed the decision to the Privy Council in London. Insofar as is reflected in the record, that appeal is pending.

On April 11, 1979, Rose Hall filed the instant action against CMOBC, the parent corporation of Chase Jamaica, and against Holiday Inns. The complaint was served on April 17, 1979. One of the alternative grounds advanced by plaintiff for imposing liability on the parent, CMOBC, for Chase Jamaica's wrongs is embodied in Paragraph 54 which was added to the Second Amended Complaint by amendment on September 30, 1982.[10] After extensive discovery, a jury

---

**8.** *See* Interrogatory Nos. 2 and 6, *infra* p. 1564.

**9.** *See* Interrogatory No. 4, *infra* p. 1564.

**10.** Paragraph 54 reads as follows:
 54. In addition to its liability under the Federal Reserve Act, referred to in paragraphs 2, 3 and 5 hereof, Chase Overseas [CMOBC] is liable for, and should be regard-

ed in law and in fact as a party to, all the wrongful acts and omissions of Chase Jamaica or "Chase" alleged in this complaint, because Chase Overseas' power of control over Chase Jamaica and Chase Jamaica's status as a purportedly separate entity, have been used, to plaintiff's injury, to justify wrong and to perpetrate and protect fraud, and to attempt further frauds. The fraud com-

**1564**

trial was held from October 12, 1982 to March 8, 1983. The jury returned the "Special Verdict Accompanied By Interrogatories to the Jury Under Rule 49(a)" on March 17, 1983. It reads as follows:

### SPECIAL VERDICT ACCOMPANIED BY INTERROGATORIES TO THE JURY UNDER RULE 49(a)

1. In selling (a) the 3,000 + acres of land and (b) the shares of Rose Hall (H.I.) Ltd. did Chase Jamaica breach its duty to act in good faith, without reckless disregard for the interests of the mortgagor, taking reasonable precautions to obtain the best available price and to avoid an unreasonable sale of excess collateral? Yes _x_ No ___

2. Did Chase Jamaica wrongfully prevent plaintiff from suing Holiday Inns in Georgia for alleged interference with the US$13 million sale either by Chase Jamaica selling to UDC shares instead of assets of Rose Hall (H.I.) or by refusing to take other action which would have permitted Rose Hall (H.I.) to join in the Georgia lawsuit? Yes _x_ No ___

3. Did CMOBC control Chase Jamaica's major decisions and actions relating to its actions under Question 1. or its actions under Question 2.?

As to Question 1.

 (a) because of the Edge Act theory and/or Yes ___ No _x_

 (b) independently of the Edge Act Yes ___ No _x_

menced in the early proceedings in the Supreme Court of Judicature of Jamaica in *Rose Hall Limited, et al. v. Chase Merchant Bankers Jamaica Limited, et al.,* Suit No. E–211 of 1976 ("The Jamaican action"). Rose Hall's attempt to enjoin the reasonably [sic] cheap sale of the Rose Hall (H.I.) shares and 3,000 ± acres of land was defeated by false representations to the Jamaican Court that Chase Jamaica had substantial assets, would continue to do business in Jamaica, and was and would be in a position to pay whatever damages might be awarded to Rose Hall. The Jamaican Court believed these misrepresentations and denied the injunction for those express reasons. When these representations were made, Chase had already decided, as alleged in paragraph 16, above, to close down its Jamaican operation and liquidate as quickly as possible all of its loans in Jamaica, and the plans had already been made whereby "we should be out of Jamaica next year around the end of June"—*i.e.,* by June, 1977, well before the Jamaican action would be expected to reach trial. Chase thereafter carried these plans out as promptly as it deemed prudent, completing them in approximately February, 1978. More recent-

As to Question 2.

 (a) because of the Edge Act theory and/or Yes ___ No _x_

 (b) independently of the Edge Act Yes ___ No _x_

4. Did Chase Jamaica, through its representations, as a result of its control by CMOBC, deceive the Jamaican court into not enjoining the sale of the collateral? Yes _x_ No ___

5. Did Holiday Inns wrongfully conspire with Chase Jamaica in (a) selling the land, or (b) the shares under Question 1. or in taking its actions under Question 2.?

 A. As to the sale of the land— Question 1.(a) Yes ___ No _x_

 B. As to the sale of the shares of Rose Hall (H.I.)— Question 1.(b) Yes ___ No _x_

 C. As to Question 2. Yes ___ No _x_

6. If the answer to Question 1. is "Yes", what damages, if any, did plaintiff suffer as a result:

 (a) for the land $ 1,500,000

 (b) for the shares $ 0

If the answer to Question 2. is "Yes", what damages, if any, did plaintiff suffer as a result: $ 4,500,000

NOTE: Answer Questions 3., 4., 5., and 6. only if Question 1. or Question 2., is answered "Yes." Regardless of your answer to Question 3., 4., or 5., answer Question 6.

ly, Chase Overseas manipulated Chase Jamaica's defense of the Jamaican action, which remained pending as a damage action against the emptied shell of Chase Jamaica, seeking unfair litigation advantage to itself in this case. By such manipulation, Chase Overseas attempted to bring the Jamaican action to trial before this case, hoping to render this action moot and to avoid a trial here "involving the extensive pretrial discovery and trial practices attendant on the Delaware action" (which were later to reveal important additional documents damaging to Chase). For these purposes, Chase Overseas openly took part in the Jamaican action (in part purportedly through Chase Jamaica) and even attempted to bargain directly with the Jamaican court by offering, in the light of Chase Jamaica's having been stripped of assets, Chase Overseas' undertaking to "pay any final judgment that may be entered against Chase [Jamaica] in [the Jamaican action] up to the extent of [devalued] Jamaican dlrs ten million" if the Jamaican court would rule in favor of Chase Jamaica on the disputed issue whether an early trial of the Jamaican action should be had.

The Special Interrogatories were formulated so that Interrogatory Nos. 1 and 2 posed the question of whether Chase Jamaica, a nonparty to this action, committed any wrong with respect to the sale of the land or Rose Hall (H.I.) shares and wrongfully prevented plaintiff from suing Holiday Inns in Georgia. Interrogatory Nos. 3, 4 and 5 sought to determine who was liable if Interrogatory Nos. 1 and/or 2 were answered in the affirmative. Interrogatory Nos. 3 and 4 inquired whether CMOBC was liable. Interrogatory No. 3 centered on liability by reason of control of Chase Jamaica under plaintiff's Edge Act theory [11] or independently of the Edge Act while Interrogatory No. 4 sought to have the jury determine on an alternative theory of liability whether Chase Jamaica deceived the Jamaican court into not issuing an injunction and whether that deception resulted by reason of control by CMOBC. Interrogatory No. 5 sought to determine whether Holiday Inns was liable to plaintiff for wrongfully conspiring with Chase Jamaica. Finally, Interrogatory No. 6 sought to have the jury's assessment of damages if Chase Jamaica did commit any of the wrongs set forth in Interrogatory Nos. 1 and 2. An assessment of damages in answer to Interrogatory No. 6 does not necessarily mean Rose Hall is entitled to judgment. The jury was instructed to assess plaintiff's damages in Interrogatory No. 6 even if it found none of the named defendants in the lawsuit responsible for the wrongs committed by Chase Jamaica. This instruction by Judge Steel to the jury on the special verdict sheet was done over objection of CMOBC at the behest of plaintiff. Plaintiff consistently maintained before Judge Steel that CMOBC is liable for

Chase Jamaica's breaches of duty under the Edge Act as a matter of law. As a consequence, plaintiff asserted prior to verdict, and presumably will assert in the future, that the jury's answers to Interrogatory Nos. 3, 4 and 5 are irrelevant, i.e., who is liable and on what theory is unimportant because CMOBC is liable as a matter of law. While ruling against plaintiff on its theory under the Edge Act, Judge Steel was obviously persuaded by plaintiff that if he were in error, a lengthy retrial could be avoided by obtaining the jury's assessment of plaintiff's damages without regard to who was liable.[12]

In answer to Interrogatory No. 1, the jury determined that Chase Jamaica wrongfully failed to realize the best available price for the land and shares of Rose Hall (H.I.) Ltd. in its sale to the U.D.C. In answer to Interrogatory No. 6, the jury found plaintiff was damaged in the amount of US$1,500,000 for the land and US$0 for the shares. Therefore, the jury necessarily concluded that at the time of the sale, the Rose Hall (H.I.) shares were worth no more to the U.D.C. than the US$8,500,000 sale price it paid and the 3000 acres were worth US$2,500,000, or US$1,500,000 more than the US$1,000,000 sale price paid by the U.D.C.

By its affirmative answer to Interrogatory No. 2, the jury determined that Chase Jamaica wrongfully prevented Rose Hall from suing Holiday Inns for interference in the US$13,000,000 sale negotiations between John Rollins and the U.D.C. In answer to Interrogatory No. 6, the jury found that as a result plaintiff suffered damages in the amount of US$4,500,000. As indi-

**11.** The Federal Reserve Act, 12 U.S.C. § 601 *et seq.* ("Edge Act"), allows banks to carry on foreign or international banking through the agency, ownership, or control of branches or local institutions. For a discussion of plaintiff's Edge Act theory see *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 494 F.Supp. 1139, 1154–56 (D.Del.1980).

**12.** Plaintiff's position was memorialized in a letter to Judge Steel:
We respectfully request that the jury be asked to determine the amount of plaintiff's damages, regardless of the answers to ques-

tions 3, 4, and 5. Plaintiff claims that, as a matter of law, CMOBC is liable for Chase Jamaica's breaches under the Edge Act, regardless of what answers the jury might give to questions 3, 4, and 5. If plaintiff later prevails on that point, but no verdict on the amount of damages had been rendered, a retrial would be necessary. That risk can be avoided, simply by taking a verdict on the amount of Rose Hall's damages regardless of the answers to questions 3, 4, and 5.
Letter from Paul P. Welsh, Esq. to Honorable Edwin D. Steel, Jr., March 4, 1983.

cated in the instructions, for the jury to arrive at this conclusion, it must have determined that in fact Holiday Inns did interfere, and that if Rose Hall had been able to sue Holiday Inns, it would have been awarded US$4,500,000 in damages.[13]

In this action, however, Holiday Inns could not be sued directly for the interference; rather it was sued only on a conspiracy theory of liability. Therefore, in order to impose liability on Holiday Inns, plaintiff was required to prove Holiday Inns conspired with Chase Jamaica in committing the wrongs described in Interrogatory No. 1 or Interrogatory No. 2. In answer to Interrogatory Nos. 5(A), (B) and (C), the jury found no conspiracy on the part of Holiday Inns. Therefore, there is no basis for imposing liability upon Holiday Inns.

Several possible bases for imposing liability on CMOBC for Chase Jamaica's wrongs were submitted to the jury in Interrogatory Nos. 3 and 4. The jury determined that CMOBC did not control Chase Jamaica's major policy decisions and actions relating to the events described in Interrogatory Nos. 1 and 2.[14] In addition, the jury found that CMOBC rebutted the presumption of control under the Edge Act, established by Judge Steel in *Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F.Supp. 1139 (D.Del.1980).[15]

Therefore, the only basis found by the jury for holding defendant CMOBC liable for the wrongs of its subsidiary, Chase Jamaica, is embodied in Interrogatory No. 4. An affirmative answer to that question constitutes a factual finding by the jury that during the injunction proceeding in Jamaica, Chase Jamaica made false representations to the Jamaican court which induced that court to defeat Rose Hall's attempts to enjoin the sale of collateral. The jury found that the Jamaican court was deceived by Chase Jamaica to believe there was no intention to close its operations and that it would remain in Jamaica with access to sufficient funds to satisfy any money judgment against it, when actual undisclosed plans to the contrary existed. The jury also found that this deception of the Jamaican court was controlled by CMOBC.

## ENTRY OF JUDGMENT

All parties are agreed that at this procedural stage the Court should enter judgment in favor of defendant, Holiday Inns, Inc. and against plaintiff.[16] Plaintiff and CMOBC disagree, however, as to whether judgment can be entered between them. Even if judgment can be entered, questions remain as to whom, and if for plaintiff, in what principal amount.

■ The differences between plaintiff and CMOBC are attributable in part to perceived inconsistencies in the special verdict. The trial court must attempt "to harmonize the jury's answers to interrogatories, if it is possible to do so under a fair reading of them." *Andrasko v. Chamberlain Manufacturing Corp.*, 608 F.2d 944, 947 (3d Cir.1979); see *Gallick v. Baltimore & Ohio Railroad Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963). On the other hand, if the interrogatory answers are hopelessly irreconcilable and the jury has been discharged, there is no alternative but to order a new trial, at least with respect to the area of factual conflict. See *Guy v. Rudd*, 480 F.2d 677 (3d Cir.1973); cf. *Franki Foundation Co. v. Alger-Rau & Associates, Inc.*, 513 F.2d 581 (3d Cir.1975). Keeping

---

**13.** The following figures illustrate the amount of damages:

| ROLLINS' DEAL | CHASE JAMAICA'S SALE | |
|---|---|---|
| $13,000,000 sale price for hotel | $9,505,000 sale price for hotel shares and land | |
| −6,250,000 BNS first mortgage | −6,250,000 BNS first mortgage | |
| $ 6,750,000 equity in hotel | 3,255,000 | |
| | −1,000,000 land price | |
| | $2,255,000 equity in hotel | |

$4,495,000 difference in equity in hotel.

**14.** Interrogatory Nos. 3(1)(b) and 3(2)(b), *supra* p. 1564.

**15.** Interrogatory Nos. 3(1)(a) and 3(2)(a), *supra* p. 1564.

**16.** Plaintiff and Holiday Inns, Inc. disagree as to the language of the judgment and taxation of costs. The former does not warrant discussion and the latter will be deferred. See *infra* p. 1583.

the above principles in mind, the Court turns to the alleged inconsistencies.

■ CMOBC first urges that the jury's negative answers with respect to whether CMOBC controlled Chase Jamaica's major decisions in answer to Interrogatory No. 3 are inconsistent with its affirmative answer as to control found in Interrogatory No. 4.[17] Interrogatory No. 3 relates only to CMOBC's control of Chase Jamaica insofar as the latter made and implemented major decisions relating to the sale of collateral (land and shares of Rose Hall (H.I.) Ltd.) and wrongfully prevented suit against Holiday Inns for its interference with plaintiff's original proposed sale of the hotel only to the U.D.C. The CMOBC control of Chase Jamaica referenced in Interrogatory No. 4 relates to the separate and distinct conduct of Chase Jamaica of "deceiv[ing] the Jamaican court into not enjoining the sale of the collateral." Control of decisions relating to sale of plaintiff's collateral by Chase Jamaica and interference with a projected law suit against Holiday Inns for the benefit of plaintiff is vastly different from control of Chase Jamaica's conduct as a party before a Jamaican court opposing issuance of a preliminary injunction. The Court holds that the answers to Interrogatory Nos. 3 and 4 are easily harmonized so as not to preclude entry of judgment.

CMOBC next urges that the answers to Interrogatory No. 6[18] are internally inconsistent. Specifically, CMOBC argues that the jury found that plaintiff suffered no damage as a result of Chase Jamaica's sale of the shares of Rose Hall (H.I.) to the U.D.C. The primary assets owned by Rose Hall (H.I.) were the hotel and the chose in action against defendant, Holiday Inns, Inc. CMOBC urges that the jury, by awarding zero damages for sale of the shares, found that the US$2,255,000 paid by the U.D.C. was the best available price for the shares. Defendant then urges that the jury's finding of zero damages for the shares necessarily "includes a finding that the price fully compensated plaintiff for the $4.5 million

claim as well as every other asset owned by Rose Hall (H.I.)."[19] CMOBC then reasons that plaintiff could not have suffered a loss of US$4,500,000 for wrongful interference with its suit against Holiday Inns since that claim was necessarily included in the jury's zero calculation of loss to plaintiff by reason of sale of the Rose Hall (H.I.) shares.

There is a telling difference between owning a chose in action and having an active, viable interest in pursuing it. Even in these litigious times, those possessing a chose in action may choose not to prosecute it for reasons personal to themselves. In those instances, even though the chose in action has no monetary value to the one possessing the right at law to prosecute suit, it could be of considerable economic worth to another who has no such inhibition. That state of affairs is easily visualized in the instant case. Both plaintiff and Chase Jamaica had trained upon the U.D.C. as the sole buyer for the Jamaican hotel with Holiday Inns, Inc. projected to continue as lessee. One has no trouble postulating that the jury could well have concluded that the U.D.C., the only viable buyer because of social and political unrest within Jamaica, had no interest in litigating with its tenant, Holiday Inns. Thus, the chose in action would have a zero value to the U.D.C. no matter how meritorious it might be, and that value to the U.D.C. would be reflected in the jury's evaluation of the stock in answer to Interrogatory No. 6. On the other hand, the jury found the same chose in action was worth $4,500,000 to plaintiff. Since the value of a chose in action can vary with the parochial interest and attitude of the one having the right to pursue it, the Court concludes there is no internal inconsistency in the answer to Interrogatory No. 6.

The final controversy with respect to the Interrogatories is directed to the form of Interrogatory No. 4.[20] Specifically, whether the issue of control of Chase Jamaica by CMOBC was left for determination by the

17. See *supra* p. 1564.

18. See *supra* p. 1564.

19. Dkt. 763 p. 29.

20. See *supra* p. 1564.

jury. CMOBC vigorously asserts that by reason of the language of question 4 as compared with the form of Interrogatory No. 3,[21] the Court predetermined that CMOBC controlled Chase Jamaica for purposes of Interrogatory No. 4. Plaintiff just as vigorously argues that by reason of the same language of Interrogatory No. 4, the issue of control of Chase Jamaica by CMOBC was left for jury determination. The parties' varying interpretations need not detain the Court for entry of judgment purposes. The jury instruction devoted to Interrogatory No. 4 expressly provided:

> If you find that the Jamaican court was deceived by Chase Jamaica to believe there was no intention to close Chase Jamaica and that it would remain in Jamaica with ongoing access to sufficient assets to satisfy a money judgment, when actual undisclosed plans and intentions to the contrary existed, *and if you find that its action was controlled by CMOBC,* then you should disregard the separate corporate entity of Chase Jamaica and find that CMOBC is liable for the wrongs of Chase Jamaica.[22]

It is appropriate to view Interrogatory No. 4 "in the context of the charge." *Gallick v. Baltimore & Ohio Railroad Co.,* 372 U.S. 108, 121, 83 S.Ct. 659, 667, 9 L.Ed.2d 618 (1963). Moreover, while CMOBC's counsel requested an additional instruction with respect to Interrogatory No. 4, he never questioned or raised any objection to its form, after having lost the skirmish on whether plaintiff was entitled to go to the jury on the theory encompassed within that Interrogatory. CMOBC's silence with respect to the form of Interrogatory No. 4 and its newly assumed litigation stance with re-

spect to whether judge or jury determined control for purposes of this special verdict question are all the more puzzling in light of the request for an additional instruction which highlights CMOBC's assumption that the control portion of Interrogatory No. 4 was within the province of the jury.[23] Similarly, plaintiff's counsel never raised a question as to the meaning and intent of Interrogatory No. 4. Language of the Third Circuit Court of Appeals is instructive:

> If the questions were not so understood, the silence of all counsel on the issue is incomprehensible. "A special verdict, finding, or answer must be construed in the light of the surrounding circumstances. It is to be construed in the light of, and in connection with, the pleadings, instructions, the issue or question submitted * * *."

*Halprin v. Mora,* 231 F.2d 197, 201 (3d Cir. 1956) (citation omitted). Considering the language of Interrogatory No. 4, and all of the aforementioned surrounding circumstances, the Court concludes that all concerned, including the jury, understood that the jury had to determine control for purposes of Interrogatory No. 4.[24] Accordingly, the Court concludes that the ambiguity sought to be introduced by CMOBC should not bar entry of judgment on the special verdict.

CMOBC raises several arguments in support of its contention that construction of the special verdict as a whole precludes entry of judgment against it. The central argument is that there is no justification for piercing the corporate veil because CMOBC did not proximately cause the injury complained of by the plaintiff. In es-

---

**21.** *Id.*

**22.** Trial Transcript p. 15,539 (emphasis added).

**23.** CMOBC requested the following instruction: "I instruct you that CMOBC cannot be held liable for any alleged fraud or other alleged acts by Chase Jamaica unless that fraud was controlled or committed by CMOBC itself, through the manipulation of the separate existence of Chase Jamaica." *See* Enclosure Accompanying letter from Charles S. Crompton, Jr., Esq., to the Honorable Edwin D. Steel, Jr., March 8, 1983, at p. 10.

**24.** Much of the apparent ambiguity concerning control for purposes of Interrogatory No. 4 was raised by the Court upon its initial glance at the Special Verdict sheet as its first action upon assignment of this case. Upon delving deeply into the record, what appeared ambiguous has become capable of reconciliation. Such reconciliation is not only possible but desirable given the policy in favor of entering judgment. *See supra* pp. 1566–67.

sence, defendant asserts that the "fraud on the court" found by the jury to have been committed by Chase Jamaica and controlled by CMOBC [25] did not proximately cause plaintiff's damages totalling US$6 million.[26]

In its affirmative response to Interrogatory No. 4, the jury found that Chase Jamaica, as controlled by CMOBC, deceived the Jamaican court into not enjoining the sale of the collateral. Subsequently, Chase Jamaica consummated the sale of the shares of Rose Hall (H.I.) and the 3000 acres of land for US$9,500,000, a price which the jury found was $1,500,000 below the best available price.[27] CMOBC asserts that the fraud did not cause the $1,500,000 in damages; rather, it merely relegated plaintiff to an adequate damage remedy in Jamaica. According to CMOBC, had plaintiff pursued its Jamaican action to trial, it would have been able to enforce any judgment for money damages against the then empty shell of Chase Jamaica because CMOBC undertook to pay any judgment up to J$10,000,000.[28] The ready answer to this contention is that assuming arguendo the plaintiff had an adequate damage remedy in Jamaica, it does not follow that plaintiff cannot be awarded relief in this Court.[29]

CMOBC further contends that the "fraud on the court" found in Interrogatory No. 4 did not proximately cause Rose Hall $4,500,-000 in damages [30] which flowed from the loss of its cause of action against Holiday Inns for interference. To support this contention, CMOBC argues that Rose Hall never pleaded that the loss of its interference claim resulted from the denial of the in-

junction. At most, asserts CMOBC, plaintiff alleged and the jury found that the defeat of the injunction resulted in the cheap sale.

Contrary to its position with respect to the internal inconsistency of Interrogatory No. 6,[31] CMOBC now ignores that this cheap sale involved not only 3000 acres of land, but also the stock of Rose Hall (H.I.). One of the assets of Rose Hall (H.I.) was the interference claim. At the time of the sale, the interference claim was transferred to the U.D.C. and became unavailable to plaintiff. Therefore, the injury plaintiff alleged resulted from the cheap sale necessarily included the loss of the cause of action. Further, in Paragraph 54 of the Second Amended Complaint, plaintiff alleged "... Chase Overseas [CMOBC] is liable for, and should be regarded in law and in fact as a party to, all the wrongful acts and omissions of Chase Jamaica ... alleged in this complaint...."[32] The complaint, read as a whole, alleges injury as a consequence of the loss of the interference claim.

Although CMOBC currently asserts that an affirmative answer to Interrogatory No. 4 is insufficient to hold it responsible for the damages found in Interrogatory No. 6, it is clear that when the Special Verdict form was prepared, all parties assumed that such a result would necessarily follow. CMOBC is actually claiming that the question of whether the wrongs in Interrogatory No. 4 *proximately caused* the damages in Interrogatory No. 6 was never submitted to the jury. However, CMOBC at no time requested an instruction on causation [33] or

---

**25.** Interrogatory No. 4, *supra* p. 1564.

**26.** Interrogatory No. 6, *supra* p. 1564.

**27.** *Id.*

**28.** There is considerable dispute about the value of this offer by CMOBC to stand behind its subsidiary. The Supreme Court of Judicature of Jamaica, confronted with this proposal in the action by Rose Hall to stay the proceedings in Jamaica, characterized CMOBC's "undertaking" as so conditional as to be "worthless." *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.,* Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam., Feb. 12, 1981) (PX 141 p. 21).

**29.** *See Chase Merchant Bankers Jamaica Ltd., et al. v. Rose Hall Ltd., et al.,* Sup.Ct. Civil Appeal No. 78/80 (Ct. of Appeal, Jam. June 23, 1982) (PX 641 p. 52–54).

**30.** Interrogatory No. 6, *supra* p. 1564.

**31.** *See supra* pp. 1564, 1567.

**32.** For the full text of paragraph 54, see *supra* note 10.

**33.** *See Reiner v. Bankers Security Corp.,* 305 F.2d 189, 194 (3d Cir.1962).

an interrogatory directed at the amount of damages flowing from the "fraud on the court." This in itself is a strong indication that CMOBC also assumed that the damages would be the same as those found in Interrogatory No. 6.

In addition, CMOBC contends that Chase Jamaica's conduct which deprived Rose Hall of the interference claim occurred after the injunction had been denied. It follows, argues CMOBC, that the plaintiff's claim relating to the deprivation had not yet accrued at the time of the fraud on the Jamaican court. Whatever merit this argument has in relation to a December, 1976 refusal by Chase Jamaica to convert the stock sale into an asset sale at the alleged request of the U.D.C., it does not preclude entry of judgment against CMOBC on the wrongful deprivation of the interference claim. Contrary to CMOBC's contention, this is not the only allegation of failure to preserve the claim that went to the jury. The Court also submitted to the jury the issue of whether Chase Jamaica "refus[ed] to take other action which would have permitted Rose Hall (H.I.) to join in the Georgia lawsuit." [34] As explained in the instructions, this "other action" included a refusal to assign the claim to Rose Hall before transferring the stock to the U.D.C.[35] There is some evidence from which the jury may have found that such a request to permit assignment of the claim was made by Rose Hall in late September, 1976, i.e., before the October-November, 1976 injunction proceeding.[36]

CMOBC further attacks the significance of the jury's finding in Interrogatory No. 4 by stating that the perjury, if any, committed by Chase Jamaica cannot serve as a basis for a cause of action under American or English and Jamaican law. Whatever merit such a claim may have, it is, as CMOBC notes, more appropriate to defer development and consideration of it until briefing on future motions for judgment notwithstanding the verdict.

Finally, CMOBC objects to entry of a judgment for plaintiff based on Rose Hall's "new theory" that CMOBC should be held responsible because it inequitably stripped Chase Jamaica of its assets in order to evade paying any judgment to plaintiff. In view of this Court's resolution of the alleged inconsistency between the responses to Interrogatory Nos. 3 and 4, and the controversy over the form of Interrogatory No. 4, it is apparent that judgment is being entered on the basis of a consistent reading of the special verdict, and not on the "new theory" of inequitable stripping of assets. Any further consideration of this alternative theory, if necessary, will be deferred until this Court's consideration of motions for judgment notwithstanding the verdict.

In summary, the Court finds no impediment to the entry of judgment based upon the jury's responses to the special interrogatories. Judgment will be entered against CMOBC in the amount of US$6,000,000 and no judgment will be entered against Holiday Inns. Having found entry of judgment appropriate, the Court now turns to those matters relevant only if judgment is entered—the currency of the award and prejudgment interest—and the two tangential matters—the outparcels and taxing of costs.

## CURRENCY OF THE AWARD (DEVALUATION)

CMOBC asserts that the US$6 million verdict must be converted into J$ and then reconverted into US$. While this appears confusing and somewhat meaningless, the effect of CMOBC's argument would have a drastic impact on the value of the award due to an anomaly between Jamaican and domestic law concerning currency conversion of judgments. Generally, courts make damage awards in the currency of the forum because such an award may be enforced more easily by the courts. When damages are calculated in a foreign currency, conversion must be undertaken to arrive at a damage award in the currency of the forum. Pursuant to Jamaican law, which

**34.** Interrogatory No. 2, *supra* p. 1564.

**35.** Trial Transcript p. 15,525.

**36.** Trial Transcript pp. 1749–59.

follows Commonwealth precedent,[37] damages are usually converted into the currency of the forum using the exchange rate in effect on the date of injury or breach. *See In re United Railways of Havana and Regla Warehouses Ltd.,* [1976] A.C. 443. The American rule, however, converts currency as of the date of judgment. *See Zimmermann v. Sutherland,* 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); *Restatement (Second) Conflict of Laws* § 144. *But see Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 865–66 (2d Cir.1981) (federal court sitting in diversity will follow New York minority breach date rule for conversion of currency), *cert. denied,* —— U.S. ——, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). Since the J$ has been devalued drastically since 1976,[38] utilization of the date of injury rate and the date of judgment rate effectively results in a drastic reduction in the judgment.[39]

■ This anomalous result is based entirely upon the assumption that a Jamaican court would convert the US$ award into J$. The parties do not quarrel that Jamaican law, with its Commonwealth precedent, governs this aspect of the form of judgment. Until recently, Anglo-American courts steadfastly held to the aforementioned rule that their courts could make monetary awards only in the currency of the forum. This rule would lead to the result CMOBC propounds because this Court, sitting in diversity, must apply the law of Jamaica—thereby requiring the US$ judgment to be converted into J$ as of the date of injury. This J$ award would then have to be reconverted into US$ as of the date of judgment since this Court may not make an award of damages in a foreign currency. *See Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.,* 643 F.2d 376, 379 n. 5 (5th Cir.1981).

This rule is summarized in the *Restatement (Second) Conflict of Laws:*

> When in a suit for the recovery of money damages the cause of action is governed by the local law of another state, the forum will convert the currency in which recovery would have been granted in the other state into local currency as of the date of the award.

*Restatement (Second) Conflict of Laws* § 144. For purposes of the form of judgment, the operative phrase is "the currency in which recovery *would have been granted.*" Thus, the central question is whether a Jamaican court could have issued a judgment in US$. If so, the *Restatement* provides:

> *When courts of state of applicable law would have calculated damages in some*

37. The parties have relied heavily upon English precedents. No Jamaican decisions regarding this issue have been brought to the Court's attention. Jamaican courts regard Privy Council decisions resulting from appeals from decisions of the Court of Appeal of Jamaica as binding precedent. Other Privy Council decisions and decisions of the House of Lords, the Supreme Court of England, and Court of Appeal of England are regarded as highly persuasive and usually are followed as precedent. Dkt. 686. (Compendium of Jamaican Law Principles); *see Allen v. Byfield* (No. 2), [1964] 8 J.F.R. 542.

38. In 1976 the exchange rate was J$1.00 = US$1.10. In March 1983, the official exchange rate was J$1.00 = US$0.56. Dkt. 700 (Stipulation dated Dec. 8, 1982). The unofficial exchange rate was J$1.00 = US$0.30 and the "parallel market rate" (a semi-official rate instituted by the Jamaican government in 1983 to more accurately reflect the international money market's floating exchange rate, *see* Ministry Paper No. 1, 4–6, Dkt. 758A, Exh. P) was approximately J$2.76 = US$1.00 (J$1.00 = US$0.36). Dkt. 767 (Stipulation dated May 27, 1983).

39. CMOBC urges application of the following formula:

$$\text{Jury Verdict in 1976 US\$} \times \frac{\text{Value of J\$ at date of judgment}}{\text{Value of J\$ in 1976}} = \text{Final Judgment in 1983 US\$}$$

Depending upon the exchange rate utilized, the US$6 million verdict would be devalued to an amount between approximately US$1.64 million and US$3.05 using CMOBC's formula. Normally, this is a jury question and CMOBC provided a proposed jury instruction regarding the application of an exchange rate to an award of damages. *See Restatement (Second) Conflict of Laws* § 144, comment c. CMOBC preferred, however, that the Court make the calculation. Dkt. 750, 42 note *. Plaintiff felt that this was a non-issue, and if it should later develop into an issue, should be determined by the Court. Letter from Paul P. Welsh, Esq. to the Honorable Edwin D. Steel, Jr., March 2, 1983.

other currency and would have given judgment in that currency. The courts of some states that are not Anglo-American will on occasion give judgment in a foreign currency. In a situation where the applicable law would have given recovery in foreign currency, the forum will convert the currency in which recovery would have been granted in that state into the currency of the forum as of the date of judgment.

*Restatement (Second) Conflict of Laws* § 144, comment f (emphasis in original). Therefore, if the Jamaican court would have awarded damages in US$, conversion is inappropriate.

A trilogy of cases decided by the House of Lords, however, marks a departure from the anachronistic rule that English courts could award damages only in sterling.[40] In 1975, in *Miliangos v. Frank (Textiles) Ltd.,* [1975] 3 All E.R. 801, the House of Lords allowed an award of damages in Swiss francs for failure to pay a debt under an agreement governed by Swiss law and which specified payment in Swiss francs.[41] In 1978, the House of Lords extended the *Miliangos* rule to claims of damages in tort, *Owners of the Motor Vessel Eleftherotria v. Owners of the Motor Vessel Despina R ("The Despina R"),* [1979] 1 All E.R. 421, and to claims of damages for a breach of contract, *Services Europe Atlantique*

(SEAS) v. Stockholms Rederiaktiebolag SVEA ("The Folias"), [1979] 1 All E.R. 421.[42]

With the apparent ability of a Jamaican court to award damages in a foreign currency firmly ensconced, the next question is whether, under these circumstances, the Jamaican court would have made such an award. In *The Despina R,* the House of Lords considered three possible currencies as appropriate for the award of damages. First, following the traditional rule as espoused in *SS. Celia (Owners) v. SS. Volturno (Owners),* [1921] 2 A.C. 544, damages could be assessed in sterling. Based upon *Miliangos,* this possibility was rejected. Second, damages could be assessed in the currency of the loss or expenditure. Third, damages could be assessed in the currency which the plaintiff normally dealt or had the closest connection with because this was the currency of the effective loss or expenditure. *The Despina R,* [1979] 1 All E.R. at 426. Under either of the two last alternatives, the House of Lords, speaking through Lord Wilberforce, found that such an award "gives [the plaintiff] exactly what he has lost and commits him only to the risk of changes in the value of that currency, or those currencies, which are either his currency or those which he has chosen to use." *Id.*

**40.** English cases are accorded substantial precedential value in this context. *See supra* note 37. Prior to *Miliangos v. Frank (Textiles) Ltd.,* [1975] 3 All E.R. 801, currencies were relatively stable due to the operation of the Bretton Woods fixed exchange rate regime. Thus, the currency of the award made little difference yet a court could more easily enforce an award in the currency of the forum. With the outset of floating exchange rates after 1971, this stability was removed thereby subjecting plaintiffs and defendants to drastic erosion or inflation of claims solely on the basis of currency fluctuation. Unlike the American system, the English judiciary has responded by allowing flexibility to avoid such phenomena. When enforcement of an award is necessary, an English court will convert the foreign currency award into pounds sterling at the exchange rate applicable at the time of enforcement. *See Choice Investments Ltd. v. Jeromnimon* (Midland Bank Ltd. garnishee), [1981] 1 All E.R. 225, 228 (Ct. of App.).

**41.** In 1976, the *Miliangos* rule, which was limited to an obligation to pay a debt in a foreign currency, was applied by lower courts to allow foreign currency judgments on a claim of damages for breach of a contract for goods or services governed by Swiss law and specifying payment in Swiss francs. *Jean Kraut A.G. v. Albany Fabrics Ltd.,* [1976] 3 W.L.R. 872 (Q.B.); *Barclays Bank Int'l Ltd. v. Levin Bros. (Bradford) Ltd.,* [1976] 3 All E.R. 900 (Q.B.).

**42.** For a discussion of this recent trend in English cases, see Brandon, "Recent Developments in English Law Affecting International Transactions," 15 Int'l Law. 629, 633–36 (1981); Knott, "Foreign Currency Judgments in Tort: An Illustration of the Wealth-Time Continuum," 43 Mod.L.Rev. 18, 18–25 (1980); *see also Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d at 866–67 n. 7.

CMOBC attempts to limit the holdings of the trilogy and its progeny to admiralty cases and cases involving foreign torts. Relying upon a recent decision of the Commercial Court of the Queen's Bench Division, CMOBC argues that the rule of *The Despina R* does not apply to purely domestic torts in Jamaica where both parties conduct business in Jamaica. *See AVX Ltd. v. EGM Solders Ltd.,* The Times 7 July 1982, 1980 A2569 (Q.B.)[43] The *AVX* decision is distinguishable on several grounds. First, under the holding in *The Despina R,* the plaintiff must show that the foreign currency was either his normal currency of operations or that the foreign currency is the measure of loss. The plaintiff in *AVX* failed to satisfy either prong. Second, the plaintiff had neither alleged losses in a foreign currency nor demonstrated that the contractual basis for the tort claim was in a foreign currency. Finally, the plaintiff, in a demand letter in 1980, claimed damages in sterling thereby weakening any claims in another currency.[44] In *AVX*, the English court was confronted with a plaintiff attempting to inflate damages by converting to a currency which had appreciated vis-a-vis sterling. Exactly the converse is evident in this case where CMOBC seeks substantial erosion of a jury award through currency conversions.

The principles embodied in the recent English trend are the traditional tort premises of *restitutio in integrum*[45] and reasonable foreseeability of the damage sustained. *The Despina R,* [1979] 1 All E.R. at 427. Whether the currency of the award is that of the plaintiff's normal operation or that of the loss is left to the discretion of the court to choose whichever is most equitable. *Id.* at 427–28. In this case there was no expenditure but the loss was felt in US$. As discussed *supra* the thwarted sale was for US$13 million. The sale by Chase Jamaica to the U.D.C. was for US$9.5 million. All evidence of damages was placed before the jury in the form of US$. Further, while it is unclear if the plaintiff's normal currency was US$, that currency was clearly associated with the property in question. The mortgage and all other substantial transactions were based upon US$. Thus, the currency of the loss and the currency of the plaintiff with respect to the transaction was US$.

In summary the Court finds that a Jamaican court would have the ability to grant judgment in US$. Furthermore, such a judgment would have been entered on these facts. This result works no undue hardship upon the parties. The loss was felt in US$ and utilization of this currency for the amount of damages was certainly foreseeable. A contrary result, however, suffers from serious defects. First, the principle of restitution would be offended, if not destroyed, if CMOBC's argument were adopted. Second, the plaintiff has already suffered the impact of effective devaluation because the award reflects 1976 US$ which are worth less than 1983 US$. Finally, the defendant should not be permitted to take advantage of an anomaly which results when two judicial systems arrive at equally valid but different dates for currency conversion. If both jurisdictions applied either the judgment day or the breach/injury day rule, the exercise would

---

**43.** In *AVX,* the plaintiff was an English subsidiary of an American corporation. The defendant was also an English corporation. In the current litigation CMOBC, not Chase Jamaica, was found liable. Therefore, even though CMOBC conducted business in Jamaica through its subsidiary, the case does not involve the type of "purely domestic tort" at issue in *AVX.* Had this action been between Rose Hall and Chase Jamaica, the holding in *AVX* might have greater application although certain distinctions remain.

**44.** CMOBC makes a similar argument in that plaintiff's Jamaican complaint sought damages in J$. This is entirely consistent with plaintiff's

current posture because the October 4, 1976 complaint was drafted only shortly after the *Miliangos* decision and well before the 1978 decision in *The Despina R* which extended *Miliangos* to tort claims. *See Federal Commerce & Navigation Co. Ltd. v. Tradax Export SA* (The Maratha Envoy), [1976] 2 All E.R. 41 (Ct. of App.) (plaintiff made claim in sterling before *Miliangos,* subsequently not precluded from claiming US$).

**45.** English courts commonly use this phrase which means "restoration or restitution to the previous condition." *Black's Law Dictionary* 1180 (rev. 5th ed. 1979).

result in a wash transaction. Only employment of differing governing rules yields a fundamentally unfair result.

## PREJUDGMENT INTEREST

Plaintiff contends that prejudgment interest should be awarded in this action.[46] CMOBC vigorously argues that prejudgment interest, as a discretionary matter, should be disallowed or substantially reduced. The questions surrounding this issue include: first, what law governs the right to prejudgment interest; second, the entitlement, if any, to prejudgment interest under the applicable law; third, the applicable rate of prejudgment interest; and fourth, whether the award of prejudgment interest, if any, should be substantially reduced. These issues will be discussed seriatim.

### Choice of Law

 For purposes of the disposition of the availability of prejudgment interest, jurisdiction based upon diversity is assumed.[47] As such, a federal court sitting in diversity must apply the same choice of law principles as a Delaware court would utilize. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In a contract action, if the contract contains a choice of law provision regarding prejudgment inter-

est, that choice will be honored. *See Oliver B. Cannon & Son Inc. v. Fidelity & Casualty Co. of New York,* No. 79–129, slip op. at 1–2 (D.Del. June 8, 1982). In the absence of such a provision, Delaware courts will engage in a choice of law analysis to determine the proper law governing the availability of prejudgment interest.

Neither the parties' submissions nor independent research has revealed relevant Delaware authority concerning the question of prejudgment interest on a tort claim where the choice of law is in dispute.[48] In the absence of a Delaware decision on point, the general principle embodied in the *Restatement (Second) Conflict of Laws* is persuasive: the substantive law selected by choice of law principles also determines the amount of damages. *Restatement (Second) Conflict of Laws* § 171. As recognized by the comments to that section, prejudgment interest is an element of damages:

> *Interest.* The law selected by application of the Rule of § 145 determines whether the plaintiff can recover interest and, if so, at which rate for a period prior to the rendition of judgment as part of the damages for a tort.

*Id.* § 171, comment C. Even though a Delaware court has not yet adopted § 145's most significant relationship test for tort

---

**46.** Postjudgment interest, of course, is now governed by a federal statute which provides for postjudgment interest at a rate reflecting the coupon yield of 52 week Treasury bills in the auction settled immediately preceding the judgment. The interest is computed daily and compounded annually. 28 U.S.C. § 1961, *see Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of New York,* No. 79–129, slip op. at 5–6 (D.Del. June 8, 1982).

**47.** The jurisdictional basis for this lawsuit is both diversity pursuant to 28 U.S.C. § 1332 and federal question pursuant to 28 U.S.C. § 1331 alleging violations of the Edge Act. 12 U.S.C. § 631 *et seq.* While some conflict between federal and state law regarding prejudgment interest might arise, this Court has already recognized its power to incorporate Delaware conflict principles in the federal aspect of the case. Dkt. 568, p. 7 (Opinion September 30, 1982).

**48.** CMOBC cites *E.M. Fleischmann Lumber Corp. v. Resources Corp. Int'l,* 114 F.Supp. 843, 845 (D.Del.1953), *aff'd,* 211 F.2d 204 (3d Cir.

1954), for the proposition that Delaware law is applicable to the issue of prejudgment interest for a tort committed in Mexico. In *Fleischmann,* however, the choice of Delaware law was not contested. *See also Aviation Assoc. of Puerto Rico v. The Dixon Co.,* 333 F.Supp. 982, 986 (M.D.Pa.1971) (law of forum applies to award of prejudgment interest; also not contested). A recently decided admiralty case by Chief Judge Latchum apparently applied Delaware law regarding the rate of prejudgment interest in a case where the substantive claims were governed by Trinidadian law. *See Slater v. Texaco, Inc.,* 506 F.Supp. 1099, 1115–17 (D.Del.1981). In *Slater,* however, the question of what law governs the award and rate of prejudgment interest was not litigated and the Court simply referred to the English and American admiralty practice of awarding prejudgment interest at the discretion of the Court. Furthermore, the plaintiffs had failed to prove their cost of borrowing thus leaving the Court with no rate other than that established by Delaware statute which the Court utilized in the exercise of its discretion. *Id.* at 1116.

cases,[49] presumably the Delaware court would follow the Restatement and apply the same law to the question of prejudgment interest as that which governs the substantive cause of action. *See Stauffer Chemical Co. v. Keysor-Century Corp.*, 541 F.Supp. 234, 239 (D.Del.1982) (in absence of Delaware decision, court assumes Delaware court would follow Restatement).

██ The parties do not dispute that Jamaican law governs the underlying claim. As such, under the previous analysis, Jamaican law governs the availability of prejudgment interest. CMOBC, however, argues that both Jamaican and Delaware law are relevant to the availability of prejudgment interest. The former applies, according to CMOBC, to the availability of prejudgment interest and the latter to the applicable rate. CMOBC bases this conclusion upon *Miliangos v. George Frank (Textiles) Ltd. (No. 2)*, [1976] 3 All E.R. 599 (Q.B.). CMOBC, however, has misconstrued Judge Bristow's opinion which, in fact states:

> I therefore ... hold that while you look to the proper law of the contract to see whether there is a right to recover interest by way of damages, you look to the lex fori to determine how much. Here it is agreed that the law of Switzerland gives a right to interest by way of damages. The lex fori ... empowers me to award interest at my discretion.... In my judgment the plaintiff should be treated mutatis mutandis in the same way as he would have been had he been awarded judgment in sterling and he had then borrowed sterling in England pending judgment so as not to be out of his money. In my judgment, he is entitled to interest during the agreed period at a rate at which someone could reasonably have borrowed Swiss francs in Switzerland at simple interest and not at compound interest.

*Id.* at 603. That court, therefore, came full circle. Recognizing the foreign law's ability to grant interest, and the domestic law's discretionary ability to set the rate, the Court in its discretion used rates applicable in the foreign forum to establish the rate of prejudgment interest. This decision has no direct bearing upon the present question because it represents a foray into Commonwealth choice of law principles. The Court need only ascertain the local law of Jamaica—not the choice of law principles a Jamaican court would utilize. *See Restatement (Second) Conflict of Laws* § 8 and comment a. The decision is important, however, in recognizing the broad discretion under English law, allotted to the Court with regard to prejudgment interest. *See* discussion *infra* pp. 1575–1576.

*Jamaican Legal Principles Regarding Prejudgment Interest*

A 1955 Jamaican statute provides, in relevant part:

> In any proceedings tried in any Court of Record for the recovery of any debt or damages, the Court may, if it thinks fit, order that there shall be included in the sum for which judgment is given interest at such rate as it thinks fit on the whole or any part of the debt or damage for the whole or any part of the period between the date when the cause of action arose and the date of the judgment:
>
>> Provided that nothing in this section—
>> (a) shall authorize the giving of interest upon interest.

The Law Reform (Miscellaneous Provisions) Act, § 3, June 6, 1955, *reprinted in* Dkt. 758A, Exh. N and Dkt. 762A, Exh. L ("1955 Statute"). Under this statute, a Jamaican court, and hence this Court, has broad discretion to fashion a prejudgment interest award subject only to the limitation that no interest upon interest is awarded.

██ CMOBC seeks to fetter this discretion with two arguments: first, that the 1955 Act must be read in conjunction with a more limited 1908 statute; and second, that the rate of interest cannot exceed the statu-

---

**49.** *See Johnston Assoc., Inc. v. Rohm & Haas Co.*, 560 F.Supp. 916 (D.Del.1983) (general discussion of Delaware courts' application of *lex loci delecti* principles in tort context; holding that in a case involving an intentional tort, the place where the defendant's wrongful conduct primarily occurred, rather than the place of injury, will determine the choice of law).

torily mandated six percent postjudgment rate. As to the first contention, CMOBC refers to a 1908 Jamaican statute which authorized a jury to award interest at a six percent rate but only in certain specified actions including: actions to enforce a debt, actions in trover or trespass *de bonis asportatis*,[50] and some insurance actions. The Interest (Allowance By Jury) Act, §§ 2, 3, June 27, 1908, *reprinted in* Dkt. 758A, Exh. M. Such a construction, however, fails to consider the obvious breadth of coverage of the later in time 1955 statute. Finding neither citation of authority nor any other construction which supports CMOBC's argument, this Court will not embrace CMOBC's argument and limit the obviously broad terms of the more recent statute.

▪ Second, CMOBC argues that the applicable prejudgment interest rate should be limited to the statutorily mandated postjudgment interest rate. A 1971 Jamaican statute establishes this rate at six percent. The Judicature (Supreme Court) Act, § 51(1), *reprinted in* Dkt. 785A, Exh. O.[51] While this argument has some appeal because it promotes consistency, it fails to account for the express latitude to establish a prejudgment interest rate granted by the 1955 Statute. Furthermore, this argument has been rejected by an English court on the basis that identical rates can only be justified if the statutorily established postjudgment interest rate is reasonable. If that rate is not reasonable, even though a court cannot avoid the statutorily mandated postjudgment rate, it should exercise the discretion granted to it to establish a reasonable prejudgment interest rate. *See*

*Jefford v. Gee,* [1970] 1 All E.R. 1202, 1210 (Ct. of App.).[52]

Having determined that this Court, applying Jamaican law, may, in its discretion, award prejudgment interest to the plaintiff, the Court now turns to the question of the period of prejudgment interest. Obviously, prejudgment interest will accrue until the date of judgment. The starting date, however, represents a more problematic issue.

As noted, the 1955 Statute allows a court great discretion in fashioning an equitable award of prejudgment interest. The statute provides that prejudgment interest may be granted "for the whole or any part of the period between the date when the cause of action arose and the date of judgment." The 1955 Statute, *supra* p. 1575. The parties basically have propounded three sets of dates as the starting date for prejudgment interest: first, September 30, 1976 for damages based upon the interference claim, and November 18, 1977 for damages based upon the land;[53] second, April 17, 1979; and third, September 30, 1982. These dates reflect respectively: first, the filing of the Jamaican lawsuit[54] or, alternatively, the accrual of the two causes of action; second, the institution of this lawsuit; and third, the amendment of the complaint to add a new theory of liability which represents the only theory upon which plaintiff prevailed.

The parties have engaged in a rather confusing series of arguments regarding each of these dates. Plaintiff, understandably, promotes the view that prejudgment interest should run from the date of accrual of the cause of action. CMOBC counters

---

**50.** This is "[t]he technical name of that species of action of trespass for injuries to personal property which lies where the injury consists in *assigning away* the goods or property." *Black's Law Dictionary* 1347 (rev. 5th ed. 1979).

**51.** The statute provides for the exercise of discretion to set "such other rate per annum as the Minister may by order from time to time prescribe in lieu [of the six percent rate]."

**52.** The English prejudgment interest statute was promulgated in 1934. The English statute and the 1955 Jamaican prejudgment interest statute have identical wording. *Compare* The

1955 Statute, *supra* p. 1575, *with* The Law Reform (Miscellaneous Provisions) Act § 3, July 25, 1934. Dkt. 762A, Exh. M.

**53.** While plaintiff has attempted to explain the distinction, the theoretical underpinnings of the difference remain a mystery to the Court. *See* Dkt. 762, p. 85 n. *.

**54.** The opinion of Justice Rowe indicates that the Jamaican lawsuit was instituted on October 4, 1976. *See supra* p. 1563. For purposes of this discussion, the discrepancy is unimportant.

that this date is appropriate, under Jamaican and English precedent, only for liquidated claims.[55]

The distinction is perhaps a fine one: a liquidated claim may best be analogized to an actual loss such as an expenditure. In such instances the date of accrual is proper. *See Jefford v. Gee,* [1970] 1 All E.R. at 1210; *Tate & Lyle Food and Distribution Ltd. v. Greater London Council,* [1981] 3 All E.R. 716, 723 (Q.B.). An unliquidated, or disputed, claim might be limited to cases where continuing intangible misfortune is not susceptible to monetary calculation. *See Jefford v. Gee* [1970] 1 All E.R. at 1208–09. In such a case, prejudgment interest should run from the date of service of the writ. *Id.* In the present context it is possible to make strong arguments in support of a characterization of plaintiff's claims as either liquidated or unliquidated. On balance, however, the Court believes that the claims were not susceptible to precise measure on the dates of accrual in the sense of an expenditure. As such, the Court will not accept plaintiff's argument, and in its discretion, under the 1955 Statute, will allow prejudgment interest from the date of service of the writ.

The plaintiff forwards another argument to support the award of prejudgment interest from 1976 to the present. Plaintiff contends that since the Jamaican action was filed in September of 1976, the Court should consider that as the "date of service of the writ." This position retains some analytical appeal. The justification for the commencement of the period of prejudgment interest at the service of the writ for unliquidated claims represents a concern that the defendant should have both notice of the claim and its amount and also a desire to foster prompt suits. Furthermore, damages for unliquidated claims, such as pain and suffering, are spread through time and

the amount cannot be quantified at the moment of the injury. *See Jefford v. Gee,* [1970] 1 All E.R. at 1209. Nonetheless, the fact remains that CMOBC was not a party to the Jamaican action even though it obviously had notice of that action. In light of the purposes behind the date of service rule, the nature of plaintiff's claim, and based upon the discretion afforded by the 1955 Statute, I will utilize the date of service on CMOBC in the Delaware action as the starting date for prejudgment interest.

This conclusion, however, does not end the inquiry. CMOBC effectively agrees that the date of service rule should be applied but argues that the relevant date should not be April 17, 1979, the date of service in this action; rather, September 30, 1982 should be utilized because that was the date that plaintiff was permitted to amend its complaint to add paragraph 54, *see supra* note 10 and accompanying text, and this was the only theory upon which plaintiff prevailed. Focusing on the notice requirement, this argument has a great deal of appeal. CMOBC had no notice of this additional theory of liability until the date of the amendment, and therefore, prejudgment interest should not run prior to that date. There are three problems with this approach: first, CMOBC had notice of the suit and the potential extent of liability much earlier than 1982; second, had plaintiff prevailed on any other theory, prejudgment interest would accrue from the filing of the action or the amendment embodying that theory; [56] and third, the very nature of the "relation back" requirement of Fed.R. Civ.P. 15(e) which determines whether amendment should be permitted, indicates that the amended complaint should be considered as having been filed as of the date of the original complaint for purposes of prejudgment interest. For these reasons,

---

**55.** Black's states that a "[c]laim for debt or damage is 'liquidated' in character if the amount thereof is fixed, has been agreed upon, or is capable of ascertainment by mathematical computation or operation of law." *Black's Law Dictionary* 839 (rev. 5th ed. 1979).

**56.** Carrying CMOBC's argument to its logical extreme renders the result that the award of

interest predicated upon the date of assertion of the particular grounds upon which plaintiff prevailed could change upon postjudgment and appellate decisions which grant or deny judgment on certain claims. Furthermore, it fails to consider situations where the merits of claims, which might have been asserted first, are not reached—such as constitutional claims.

the better rule is that prejudgment interest, if awarded, will run from service of the original complaint. It is important to note that in this inquiry the Court seeks only to establish the proper starting date for an award of prejudgment interest. As will be explained *infra*, English courts, and hence this Court, enjoy discretion to equitably adjust this period of time after a benchmark is established. *See infra* pp. 1580–1581.

In summary, prejudgment interest will be awarded under Jamaican law and shall be calculated from the period of April 17, 1979 to the present.

*Rate of Prejudgment Interest*

As previously stated, Jamaican law, not the law of the forum, will govern the rate of prejudgment interest. As also stated, the rate of prejudgment interest is not limited by the six percent statutorily mandated postjudgment rate; rather, the Court enjoys the ability to grant prejudgment interest "at such rate as it thinks fit." 1955 Statute, *supra* p. 1575. The only limitation on this discretion is that interest may not be awarded on interest; therefore, only simple and not compound interest may be awarded.

The parties have presented a plethora of potential interest rates in addition to the six percent postjudgment rate. These include: the London Inter-Bank Offered Rate ("LIBOR"); [57] the average prime rate; the yield on short term (3 month) United States Treasury Bills; the yield on long term United States Treasury Bonds; the interest paid on savings deposits in United States banks; the yield on Moody's Aaa corporate bonds;

the yield on Standard & Poor's 400 Industrials; and the rate of return of the plaintiff. Affidavit of Gail W. Melick, May 24, 1983 Hearing, PX 1; Stipulation of May 27, 1983, Dkt. 767. Being directed to no Jamaican decision on point, the Court once again turns to Commonwealth decisions for guidance. [58]

The English cases start with a premise familiar to our jurisprudence: prejudgment interest is not punitive; rather, it seeks to compensate the plaintiff for being out of money which he ought to have either received or retained. *See Jefford v. Gee,* [1970] 1 All E.R. at 1206; *Tate & Lyle Food and Distribution Ltd. v. Greater London Council,* [1981] 3 All E.R. at 723; *Cremer v. General Carriers S.A.,* [1973] 1 W.L.R. 341, 355 (Q.B.). In personal injury cases, English courts have awarded prejudgment interest based upon the so-called short-term investment rate calculated as an average during the litigation. This rate reflects the return on funds deposited with courts during the pendency of litigation and is statutorily established by sections 6 and 7 of the Administration of Justice Act. The rate is fixed from time to time by rules made by the Lord Chancellor. In this sense it represents a form of a return on investment rate because the party receives interest based upon a deposit and not based upon the applicable loan rate. *See Jefford v. Gee,* [1970] 1 All E.R. at 1210; *Cremer v. General Carrier S.A.,* [1973] 1 W.L.R. at 355. In commercial cases, however, the short-term investment rate has not been utilized because it is considered too inflexible and too

---

**57.** LIBOR is a US$ interest rate. It represents the rate at which English banks make Eurodollar (US$ outside the United States) loans to other banks. LIBOR is commonly used in pricing floating rate US$ loans. Affidavit of Gail W. Melick, May 24, 1983 Hearing, PX 1, ¶ 4. Transcript of May 24, 1983 Hearing, Dkt. 765, p. 10 (testimony of Gail W. Melick).

**58.** The two Jamaican decisions cited by CMOBC establish prejudgment interest at six percent. *See McNair v. The Kingston & Saint Andrew Corp.,* [1979] Jamaica Supreme Court Judgments 463; *Savoy Constr. & Dredging Co. (Jamaica) Ltd. v. Motor Owners Mutual Assoc. Ltd.,* [1979] Jamaica Supreme Court Judgments 302. Neither case, however, has any discus-

sion of the genesis of this rate. Absent also is any indication that the rate was contested in either case. Plaintiff has brought two recent Jamaican judgments to the Court's attention which awarded prejudgment interest at rates of twelve and fifteen percent respectively. *See* Letter from Paul P. Welsh, Esq. to the Honorable Murray M. Schwartz (May 27, 1983) (enclosing copies of judgments of the Supreme Court of Judicature of Jamaica in *Hapag-Lloyd AG v. Coptic Container Ltd.,* C.L. H.111 of 1981 (March 14, 1983), and *Inter-Alliance Trading Corp. v. Sew-Wel of Jamaica Ltd.,* C.L. 1978/I–019 (September 23, 1981). While the precedential value of these judgments is uncertain, they do indicate that awards of prejudgment interest may exceed six percent.

unresponsive to changing conditions. *Tate & Lyle Food and Distribution Ltd. v. Greater London Council,* [1981] 3 All E.R. at 723. In such cases, the rate employed has been the average borrowing rate an average plaintiff would have had to pay to receive the same amount of money. *Id.* In *Cremer* and *Tate & Lyle,* prejudgment interest was awarded at one percent above the minimum lending rate ("MLR") which represents the cost of borrowing sterling. It follows that the LIBOR rate, which represents the cost of borrowing US$ (the currency at issue here) should be utilized in this case.

Both parties argue against this construction. The plaintiff weaves a tragic, though realistic, tale of woe about economic reality and how simple interest cannot compensate it for its loss of the use of its money. *See* Dkt. 762, p. 76–78. Plaintiff therefore recommends that the LIBOR rate be increased by adding 9 to 10½ percent in order to achieve an "equitable" result. Affidavit of Gail W. Melick, May 24, 1983 Hearing, PX 1, ¶ 8. This contention is easily disposed of: plaintiff should not and will not be permitted to circumvent the explicit statutory prohibition on awarding interest on interest. *See Miliangos v. George Frank (Textiles) Ltd. (No. 2),* [1976] 3 All E.R. at 602 ("To award simple interest at a rate to produce the equivalent result is, in my judgment, equally unacceptable because it is doing by the back door what the statute says you must not do by the front door.").

On its part, CMOBC raises several arguments against the use of the LIBOR or cost of borrowing rate. First, this rate fails to consider plaintiff's financial condition and its consequent probable inability to borrow at average commercial rates. In *Miliangos (No. 2),* however, the court stated that the actual cost to a particular plaintiff was irrelevant and that the court should award prejudgment interest at the borrowing rate of an average plaintiff in a similar business. *Id.* at 602. Second, CMOBC argues that use of a cost of funds rate would provide plaintiff with funds which it never would have received because plaintiff's rate of return throughout this period was negative and therefore even if plaintiff had these funds, it would have received no return on them.

For this reason, CMOBC argues that plaintiff is entitled, at best, to a prejudgment interest rate equal to its actual rate of return. Dkt. 763, p. 38 note *. For reasons similar to those stated for rejecting the use of the actual borrowing rate, the average rather than the actual rate of return (which was negative) should be favored. Finally, CMOBC contends that the English cases utilizing the average borrowing rate concern instances of actual expenditure of funds. *See Id.* at 601; *Tate & Lyle Food and Distribution Ltd. v. Greater London Council,* [1981] 3 All E.R. at 723; *cf. Cremer v. General Carriers,* [1974] 1 W.L.R. at 346 (while expenditure for repairs or injury not made, the contracted for goods were paid for thereby incurring an out-of-pocket expenditure). In *Cremer,* the court stated that "[t]here is no such thing as a correct rate of interest applicable to all cases. It is a matter for the discretion of the court in each case." *Cremer v. General Carriers,* [1974] 1 W.L.R. at 356.

In light of these considerations, the Court has determined to use a composite analysis to arrive at a reasonable interest rate. As noted in *Cremer* and *Jefford,* English judges retain broad discretion to fashion an equitable rate and are not slavishly tied to any one measure. *Cf. Miliangos v. George Frank (Textiles) Ltd. (No. 2),* [1976] 3 All E.R. at 603 (court, in exercise of discretion under the 1955 Statute, uses interest rate applicable in Switzerland during relevant time period). What follows in justification of the Court's approach goes beyond what English courts generally require to justify the imposition of a single rate. First and foremost, due to the nature of the parties, English or Jamaican rates are not the only relevant rates. Plaintiff may well have chosen to invest or borrow from American banks. Second, an expenditure is no different economically in this context than a failure to receive payment for the sale to the U.D.C. In either situation—an expenditure related to the injury or an expenditure caused by the nonavailability of anticipated and earmarked funds—plaintiff would have to borrow funds. While economically identical, the characterization of an amount as an expenditure or a failure to

receive payment, may have differing legal effects. As such, this case falls somewhere between the English expenditure cases which utilize a cost of funds approach and personal injury cases such as *Jefford* which utilize a statutorily established return on investment approach. *See supra* pp. 1578–1579. Therefore, I hold that the utilization of rate of return figures in a composite is permissible. *Cf. Cremer v. General Carriers,* [1974] 1 W.L.R. at 357–58 (court considers average lending rate at 7.9%, average statutory short term investment of 7.1% and utilizes rate of 7.5% which corresponded to the average judgment debt rate). Third, since speculation over return and borrowing rates is evident and the Court enjoys broad discretion, a composite figure represents the most objective starting point to establish an equitable interest rate. Upon analysis, the Court finds that a rate of 13.85 percent represents a reasonable prejudgment interest rate.[59]

*Equitable Adjustment*

■ An award of prejudgment interest may be decreased in order to achieve an equitable result. In *Jefford v. Gee,* Lord Denning noted that "[i]n exceptional cases, such as when one party or the other has been guilty of gross delay, the court may depart from above suggestions [regarding prejudgment interest] by diminishing or increasing the award of interest, or altering the periods for which it is allowed." *Jefford v. Gee,* [1970] 1 All E.R. at 1212. Neither the parties nor independent research has revealed any Jamaican or Commonwealth case which defines the parameters of a judge's discretion pursuant to the 1955 statute.[60] Nonetheless, the statute states

59. This rate is a composite of the following: LIBOR plus two percent; prime rate plus two percent; and short and long-term Treasury obligations. Rates for Standard & Poor's industrials, corporate bond rates, and savings accounts are not utilized as they are unrealistic in relation to either the cost of funds or rate of return of an average plaintiff in the land development business. The LIBOR and prime rates are increased by two percent on the authority of English precedent and the testimony of Melick that an average land development company would borrow money at the prime rate plus 2 to 5 percent. *See Tate & Lyle Food & Dist. Ltd. v. Greater London Council,* [1981] 3 All E.R. at 722; Transcript of May 24, 1983 Hearing at 21–22.

| Date(A) | Average LIBOR(B) Plus 2% | Average Prime Rate Plus 2% | Average Short Term (3 mo.) U.S. Treas. Bills | Average Long Term U.S. Bonds |
|---|---|---|---|---|
| April–Dec. 1979 | 13.28 | 14.97 | 10.27 | 9.36 |
| Jan.–Dec. 1980 | 14.25 | 17.27 | 11.61 | 11.22 |
| Jan.–Dec. 1981 | 19.25 | 20.87 | 14.07 | 13.20 |
| Jan.–Dec. 1982 | 16.00 | 16.86 | 10.72 | 12.51 |
| Jan.–June, 1983(C) | 11.94 | 12.69 | 8.19 | 10.62 |
| Average(D) | 15.40 | 17.08 | 11.34 | 11.59 |

Composite Average 13.85%

(A) The information is derived from the stipulation of May 27, 1983, Dkt. 767, and the Affidavit of Gail W. Melick, May 24, 1983 Hearing, PX 1.

(B) The six month LIBOR rate was provided for June and December of each year.

(C) Some figures for 1983 were not provided by the parties. For purposes of calculation, the missing rates are assumed to be the same as the immediately preceding rate.

(D) The average is derived by weighting the yearly averages by the number of applicable quarters. For example, the 1979 rates were in effect for three quarters, the 1980, 1981 and 1982 rates for four quarters, and the 1983 rates for two quarters.

60. Plaintiffs cite *Tate & Lyle Food & Dist. Ltd. v. Greater London Council,* (1981) 3 All E.R. 716, 722, for the proposition that an English court will not reduce prejudgment interest for delay in litigation when there has been no fault on the part of the plaintiff. This case, however, fails to shed any light on whether and under what circumstances a court *may* reduce an interest award. Due to the inability to find binding English or Jamaican authority, the

that prejudgment interest may be granted "at such rate as [the Court] thinks fit." *See* 1955 Statute, *supra* p. 1575. Having already examined the wide latitude to structure an applicable benchmark rate, the statute clearly grants further discretion to adjust the rate to reach an equitable result.

Similarly to English courts, Delaware courts have recognized a court's ability to reduce an interest award for undue delay. *See Pack & Process, Inc. v. Nabisco, Inc.*, No. 78–285 slip op. at 1–2 (D.Del. Sept. 18, 1981); *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 211 (Del.1978). While this hard fought litigation has taken over four years, it has proceeded in an orderly fashion without any party deliberately frustrating or stalling the steady progress toward resolution. Time consumed due to the vicissitudes of litigation does not warrant a reduction in the award of prejudgment interest. Nonetheless, plaintiff did delay until September of 1982 to amend its complaint to allege the theory of liability upon which it eventually prevailed. While the Court has already held that the date of amendment should not be critical for purposes of identifying the accrual date for prejudgment interest, *see supra* p. 1578, this does not impact upon the exercise of discretion to reach an equitable award of prejudgment interest. Here the plaintiff alone is responsible for the delay in assertion of the new theory of liability thereby precluding any assessment of its settlement merit by CMOBC until almost all pretrial expense had been incurred. When a plaintiff passively depends on the evolutionary development of its theories during the course of litigation, an English court, and hence this Court, has the discretion to reduce or deny prejudgment interest.

Delay, of course, is not the only grounds for reduction or denial of prejudgment interest. Awards may also be reduced or denied for inflated claims. *See Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3d Cir.1981), *cert. denied*, 456 U.S. 961,

102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); *E.M. Fleischmann Lumber Corp. v. Resources Corp. International*, 114 F.Supp. 843, 845–46 (D.Del.1953), *aff'd*, 211 F.2d 204 (3d Cir. 1954).

CMOBC argues that the vastly inflated claims of the plaintiff precluded settlement, thereby requiring this lengthy litigation. Plaintiff counters with three arguments: first, plaintiff disputes the characterization of its claims as inflated; second, plaintiff notes that CMOBC had never engaged in meaningful settlement negotiations; and third, plaintiff argues that its damage claims constitute good faith estimates of the extent of injury. The second point is perhaps the easiest to address. The complaint alleges damages in the amount of US\$72,000,000 *plus* US\$XX,000,000 in punitive damages. Dkt. 406. Given this grandiose claim as an estimate of liability, the Court will not penalize CMOBC for not engaging in settlement negotiations.

The other two grounds of plaintiff's objection are intertwined. As noted, the complaint in this action demanded a sum far in excess of US\$72 million. The bulk of this figure, US\$40,000,000 is based upon plaintiff's theory that the proper measure of damages for the land is what plaintiff refers to as fair market value but which, in reality, represents a form of future, fully developed, potential value. *See* Dkt. 406, ¶ 30. An analogous theory was apparently placed before Justice Rowe in the Jamaican injunction action. Plaintiff produced a 1973 assessment placing the value of the land at approximately \$40,000,000 taking into consideration the development potential. A second appraisal, performed by the same valuators in 1976, placed the value of the land sold as a block including buildings, roads, and water system, at \$7–\$8 million. Plaintiff placed the combined value of the land and the hotel in 1976 at \$20–\$21 million. *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.*, Suit No. E–211 of 1976, (Sup.Ct. of Judicature of

Court will look for guidance to American cases. *See Phoenix Canada Oil Co. v. Texaco Inc.*, 560 F.Supp. 1372, 1383 at n. 31 (D.Del. 1983); *Ja-*

*pan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil Co.*, 456 F.Supp. 831, 840 n. 17 (D.Del.1978).

Jam., Jan. 17, 1977). (PX 140, pp. 7, 10–11). Despite plaintiff's various contentions and arguments, Justice Rowe wrote: "The plaintiffs say that if their contentions as to the true market value of the land and the shares are upheld, then their damages could be quantified at about $10,000,000." *Id.* at 14. With this figure as a basis, Justice Rowe denied the preliminary injunction because Chase Jamaica had assets of approximately J$10,000,000. *Id.* at 15. Justice Rowe implicitly rejected plaintiff's potential market value evidence in his preliminary determination of Jamaican law. *Id.* at 10, 12. Had this not been the basis for his holding, Justice Rowe would have either granted the injunction or made a finding that Chase Jamaica, with or without the assistance of CMOBC, could satisfy a judgment based upon the allegedly much greater potential value.

Even though plaintiff sought only $10 million in damages in Jamaica for the injury to the land, in the instant action, plaintiff sought US$40 million for the same underlying injury.[61] As noted, Justice Rowe considered plaintiff's potential market value evidence as "highly speculative," *Id.* at 10; nonetheless, plaintiff sought to propound the same evidence and theory in this action. This theory of potential market value was rejected by the Magistrate in favor of a construction of Jamaican law utilizing "best available price" as the measure of damages. Dkt. 486, pp. 10–13. This construction was adopted by Judge Steel. Dkt. 559, p. 3.

Despite this Court's rejection of the theory, plaintiff was permitted to introduce evidence of the fair market value potential of the land at trial for a very limited purpose.[62] The Court admitted this testimony in evidence over the defendants' relevance objection, on the plaintiff's counsel's representations that it was relevant to the mortgagee's duty of exercising reasonable precautions and good faith.[63] In essence, Judge Steel postponed the determination of the relevance issue until the time of charging the jury by stating as follows:

I am not going to interrupt the trial. I will try to take care of this as best as I can when I hear the evidence, rule on other evidence. I will do the best I can. When I charge the jury, if there is a case to go to the jury.[64]

The Court again addressed the issue when it advised counsel on matters appropriate for inclusion in the closing arguments by stating "[t]he lawyers should not refer in their statements to the jury to the market value of either the shares or the land." [65] In its instruction to the jury, the Court omitted plaintiff's proposed charges on fair market value (Dkt. 764) and included instruction on the best available price as the measure of damages for a mortgagee's wrongful sale.[66]

In support of its argument that any award of prejudgment interest should not be reduced or denied on equitable grounds, plaintiff, relying upon internal memoranda prepared during trial, asserts that the resulting damage figures represent good faith estimates under its theory.[67] Whatever else the memoranda might be, they should not serve as a basis for declining to adjust downward the prejudgment interest rate. In this case, ignoring the claim for punitive

---

61. The Court recognizes that the two actions are not identical, *see Chase Merchant Bankers Jamaica Ltd., et al. v. Rose Hall Ltd., et al.,* Sup.Ct. Civil Appeal No. 78/80, (Ct. of Appeal, Jam., June 23, 1982) (PX 641, pp. 21, 32–33). However, the injury claimed as it relates to the loss of the 3000 acres of land is common to both.

62. *See* Testimony of R.P. McDaniel, Trial Transcript pp. 4912–5114.

63. Trial Transcript pp. 5097–5111.

64. Trial Transcript p. 5111.

65. Trial Transcript p. 14,820, *citing* The Jamaican Law Compendium, Dkt. 686, p. 7 ¶ 24 and p. 9 ¶ 32 (establishing best available price as the appropriate standard of damages).

66. Trial Transcript pp. 15,517–24, 15,548–49.

67. Plaintiff's counsel tendered two in-house memoranda concerning the basis for damage calculations. These documents, however, were generated in November of 1982—over three and one-half years *after* institution of the law suit. Dkt. 1. (In addition, Dkt. 406, the Second Amended Complaint, also predates these documents.)

damages, plaintiff made a claim for compensatory damages which exceeded the damage award slightly in excess of 1000%.[68] The Court finds it inequitable to charge CMOBC with the full rate of prejudgment interest given plaintiff's delay in filing the amendment and its inflated demand.

Upon consideration of the applicable Jamaican law and noting the wide discretion afforded the Court under the 1955 Statute to fashion an equitable award of prejudgment interest, the rate of prejudgment interest shall be reduced to six percent. Plaintiff shall be entitled to prejudgment interest for the period of April 17, 1979 to the date of entry of judgment at a simple interest rate of six percent.

## OUTPARCELS

The plaintiff has requested this Court to issue a declaratory judgment that if the U.D.C. fails to reconvey the outparcels[69] by October 1, 1983, CMOBC is liable to Rose Hall for resulting damages. After the second pretrial conference held on September 15, 1982, Judge Steel ordered:

> As to A–6(a) ["Loss of or damage to the so-called outparcels"], this matter can be determined by declaratory judgment if relief is warranted. Such a judgment can determine plaintiff's entitlement to damages if the outparcels are not recovered by plaintiff in 12 months, with the

amount of damages to be fixed, if necessary, in further proceedings.

Dkt. 580, p. 2 (Oct. 4, 1982).

By this order, Judge Steel deferred for 12 months the issue of what relief, if any, is warranted. During this period of time, the parties will presumably be attempting to arrange the reconveyance without judicial intervention.

## COSTS

The parties are in dispute over the proper taxation of costs. This issue as it relates to all litigants will be deferred until this Court's disposition of motions for judgment notwithstanding the verdict.

## CONCLUSION

On the basis of the foregoing analysis, judgment will be entered in favor of Holiday Inns against plaintiff and in favor of plaintiff against CMOBC in the amount of US$6 million. Prejudgment interest at six percent simple interest rate will be awarded on this sum for the period commencing April 17, 1979 until the entry of judgment. Consideration of issues relating to the so-called outparcels and taxing of costs will be deferred.

---

**68.** Plaintiff requested US$72 million in compensatory damages which included US$11 million for the outparcels or a net of US$61 million as damages for the dispute determined by the jury. Moreover, if the Court focuses solely upon the difference in the damages claimed for the land by the plaintiff in this action (US$40 million) and the damages awarded by the jury (US$1.5 million) the claim exceeds the award by 2667%. The Court of Appeals for the Third Circuit has upheld the discretionary denial of prejudgment interest in a case where the claim exceeded the award by 380%. *See Matter of Bankers Trust Co.,* 658 F.2d at 109–11.

**69.** *See supra* pp. 1561, 1562.